Michael J. KALLOK, et al., Respondents,

v.

MEDTRONIC, INC., Appellant.

No. C2–96–1598.

Supreme Court of Minnesota.

Jan. 15, 1998.

Rehearing Denied Feb. 27, 1998.

William Z. Pentelovitch, Richard G. Wilson, Mary R. Vasaly, Maslon Elelamn Borman & Brand, Minneapolis, for appellant.

Michael Berens, Madge S. Thorsen, Wendy A. Snyder, Andrea Carruthers, Kelly & Berens, P.A., Minneapolis, for respondents.

## OPINION

ANDERSON, Justice.

On November 21, 1995, Dr. Michael J. Kallok resigned his position as a research scientist and senior manager at Medtronic, Inc. When Kallok submitted his resignation, he advised Medtronic that he had accepted a job offer from respondent Angeion Corp., a direct competitor of Medtronic. Medtronic informed Kallok that if he accepted a position at Angeion, he would be in breach of his noncompete employment agreements with Medtronic. To determine Kallok's rights and obligations under the employment agreements, Angeion and Kallok brought an action against Medtronic for a declaratory judgment asserting that the agreements were unenforceable. Medtronic counterclaimed against Kallok for breach of contract and for injunctive relief to prevent Kallok from working for Angeion during relevant time periods. Medtronic also counterclaimed against Angeion for tortious interference with the employment agreements it had with Kallok.

The district court concluded that the employment agreements were valid and en-

joined Kallok from working for Angeion for one year. The court also concluded that Angeion had tortiously interfered with Kallok's employment and that Angeion was liable for damages as measured by the attorney fees and other expenses Medtronic incurred in its litigation with Kallok. The court of appeals affirmed the district court's grant of an injunction, but reversed the court's conclusion that Angeion tortiously interfered with Kallok's employment. We reverse, concluding that Angeion tortiously interfered with Medtronic's employment agreements with Kallok. We also hold that the district court's damages award was proper.

Medtronic, Inc. is a Minnesota company that manufactures medical devices with an emphasis in cardiovascular equipment and related medical devices. Angeion Corp. is a Minnesota company that manufactures cardiac medical devices, primarily implantable cardioverter defibrillators (ICDs).[1] Medtronic and Angeion are direct competitors in the area of the management of tachyrhythmia (rapid irregular heartbeats), including the manufacture of ICDs.

Kallok has a Ph.D. in biomedical engineering from the University of Minnesota. In 1979, Medtronic hired Kallok as a Senior Staff Engineer engaged in leads research. In this position, Kallok was involved in designing and developing leads for, among other things, defibrillator and electrocardiogram sensing. Kallok signed a standard Medtronic noncompete employment agreement that contained a confidentiality provision and restrictions on his ability to work for Medtronic's competitors. Kallok subsequently signed a revised version of Medtronic's employment agreement in 1981. In pertinent part, the revised agreement states:

[F]or two (2) years after termination of employment he/she will not directly or indirectly render services (including services in research) to any person or entity in connection with the design, development, manufacture, marketing, or sale of a Competitive Product that is sold or intended for use or sale in any geographic area in which Medtronic actively markets a Medtronic Product or intends to actively market a Medtronic Product of the same general type or function. It is expressly understood that the employee is free to work for a competitor of Medtronic provided that such employment does not include any responsibilities for, or in connection with, a Competitive Product as defined in this Agreement for the two year period of the restriction.[2]

The agreement also provided that Medtronic would compensate its employees if the agreement hampered their earning capacity after leaving Medtronic.

Throughout his tenure at Medtronic, Kallok held a variety of research positions. He worked in Medtronic's Pacing Division and by the early 1990s became the Director of Physiological Research Laboratories (PRL) within that division. As Director of PRL, Kallok was responsible for, among other things, educating physicians about Medtronic's ICDs and related products for tachyrhythmia management. In 1992, Kallok became the Director of Research, Clinical Research and Regulatory Affairs for Medtronic's Heart Valve Division. In 1994, he was named a Bakken Society Fellow. The Bakken Society includes approximately

1. For a detailed discussion on the use and effectiveness of ICDs, *see* The Antiarrhythmics Versus Implantable Defibrillators Investigators, *A Comparison of Antiarrhythmic Drug Therapy with Implantable Defibrillators in Patients Resuscitated from Near–Fatal Ventricular Arrhythmias*, New Eng. J. Med., Nov. 27, 1997, at 1576; and *Prophylactic Use of Implanted Cardiac Defibrillators in Patients at High Risk for Ventricular Arrhythmias after Coronary–Artery Bypass Graft Surgery*, J. Thomas Bigger, Jr., M.D., New Eng. J. Med., Nov. 27, 1997 at 1569.

2. The Medtronic employee agreement defines a Competitive Product as:

[A]ny product, product line or service (including any component thereof or research to develop information useful in connection with a product or service) that is being designed, developed, manufactured, marketed or sold by anyone other than Medtronic and is of the same general type, performs similar functions, or is used for the same purposes as a Medtronic Product on which the employee worked during the last two years of employment or about which he/she received or had knowledge of Confidential Information.

the top 25 scientists employed by Medtronic. The society holds regular meetings and symposia that provided Kallok access to a wide range of Medtronic research. In 1995 Kallok became a Senior Fellow in Medtronic's Promeon Division, Center for Biomaterials Research. During Kallok's time at Medtronic, his research and development efforts led to the issuance of 15 patents on which he was named as either the sole inventor or a co-inventor.

As Kallok advanced within Medtronic, he was invited to participate in Medtronic's Management Incentive Plan, which provided him new responsibilities, access to additional confidential information, and new benefits. In consideration for the additional benefits he received under this incentive plan, Kallok signed a series of noncompete employment agreements known as Medtronic Management Riders in 1986, 1989, and 1993, agreeing to additional restrictions on his future employment. The last management rider Kallok signed provided in relevant part that:

> For a period of one (1) year after termination of my employment with Medtronic, I will not directly or indirectly render services for the benefit of any person or organization (including myself) engaged in the design, development, manufacture, marketing or sale of a product or service competitive with any product or service which was being designed, developed, manufactured, marketed or sold by Medtronic during the last year of my employment, or with respect to which Medtronic has acquired confidential business information, unless: (i) I did not have any involvement or responsibility in connection with the competitive product or service while at Medtronic and did not have access to confidential business information regarding the competitive product or service; or (ii) such other person or organization is a diversified operation and my responsibilities do not include any activities in connection with the design, development, manufacture, marketing, or sale of a competitive product or service.

As Medtronic did in the employee agreement, Medtronic agreed to supplement the employee's salary after the employee left Medtronic if the management rider restricted the employee's ability to earn a comparable salary.

In 1995, Kallok arranged to meet with Angeion's CEO Whitney McFarlin to discuss potential employment opportunities. McFarlin is a former Medtronic vice president and he and Kallok knew each other from when they both worked at Medtronic. At the meeting on May 10, McFarlin told Kallok that Angeion had no suitable positions available. During the summer of 1995, however, an Angeion official contacted Kallok regarding a position managing Angeion's catheter ablation business. McFarlin and Kallok met on September 1, 1995 to discuss Kallok's interest in this position. On September 20, 1995, Kallok again met with McFarlin and, at that time, McFarlin asked Kallok if he would be interested in serving as Angeion's Vice President of Research. In that capacity, Kallok would research tachyrhythmia, coordinate intellectual property, and develop future technologies. Kallok expressed an interest in this position.

During the months he met with McFarlin to discuss possible positions with Angeion, Kallok continued to perform his duties as an employee of Medtronic. As part of those duties, on October 3 through 6, 1995, Kallok participated in Medtronic's annual vice presidents' meeting. During this four-day conference, Kallok attended meetings and presentations relating to new technologies being pursued by Medtronic, including technologies related to Medtronic's tachyrhythmia business. After returning from the meeting, Kallok resumed discussions with Angeion about the position as Vice President of Research and Development for ICDs. Sometime during the course of these discussions, between September 20, 1995 and October 18, 1995, Kallok informed McFarlin that he might be subject to noncompete agreements with Medtronic because he signed the employment agreement and management rider. The record is unclear as to the actual date that Kallok revealed this to Angeion. The record demonstrates, however, that McFarlin, as a former Medtronic executive, assumed that Kallok was subject to a noncompete agreement.

On October 18, 1995, McFarlin contacted Angeion's outside counsel in order to ascertain whether Kallok's employment agreement and management rider prohibited Kallok from working for Angeion.[3] Outside counsel indicated that because they represented Medtronic in an unrelated matter, this conflict of interest prohibited them from fully researching the issue. Nonetheless, McFarlin continued to solicit an opinion from outside counsel and proceeded to tell counsel that Kallok had not worked in the tachyrhythmia area at Medtronic within the previous two years and did not have access to any confidential information during that time frame. Based solely on the information McFarlin gave them regarding Kallok's employment agreements and background, Angeion's counsel told McFarlin that Kallok's prospective employment at Angeion would not violate his agreements with Medtronic. In pretrial proceedings, Angeion's counsel denied that they actually gave Angeion legal advice regarding Angeion's decision to hire Kallok. To the contrary, Angeion's counsel claims only to have "confirm[ed] the obvious" by telling McFarlin that if Kallok was "not in violation of the agreement, he's not in violation of the agreement." After talking to outside counsel, McFarlin proceeded to offer Kallok the position of Vice President of Research and Development for ICDs.

While Kallok considered his employment offer at Angeion, he attended Medtronic's annual Science & Technology Conference on November 2 and 3, 1995, and made a presentation. The purpose of this conference was to inform Medtronic's scientists and business managers of the results of certain significant research ventures that Medtronic was conducting. The presentations made at the conference were summarized in abstracts and collected in individually numbered books marked "Confidential." These books were distributed only to certain Medtronic employees, including Kallok. Following this conference, Kallok continued to discuss Angeion's job offer with McFarlin. Less than three weeks later, on November 21, 1995, Kallok informed Medtronic that he was going to resign effective December 1, 1995 and would begin work at Angeion. On November 28, 1995, Medtronic informed Kallok in writing that he would breach the noncompete provisions contained in the employment agreement and management rider if he accepted work at Angeion. Notwithstanding Medtronic's warnings, Kallok accepted the job offer from Angeion and executed a noncompete agreement with Angeion. Kallok began working for Angeion on Monday, December 4, 1995.

On December 1, the Friday before Kallok began work at Angeion, Kallok and Angeion commenced a declaratory judgment action in Hennepin County District Court to determine Kallok's rights and obligations under Medtronic's noncompete agreement and management rider. Medtronic answered and counterclaimed against Kallok for breach of contract and sought to enjoin Kallok from violating his noncompete agreements. Additionally, Medtronic counterclaimed against Angeion for tortious interference with the noncompete agreements it had with Kallok. After a lengthy bench trial, the district court enjoined Kallok from working at Angeion for one year, enjoined Angeion from employing Kallok in any capacity for one year, concluded that Angeion tortiously interfered with Kallok's noncompete agreements with Medtronic, and awarded Medtronic damages against Angeion for tortious interference with the noncompete agreements between Medtronic and Kallok.

The district court measured Medtronic's damages by the amount of attorney fees and other expenses it incurred in its litigation with Kallok. The exact amount of Medtronic's damages was not determined at the time of the court's ruling. After a separate hearing, the court established Medtronic's total attorney fees and other expenses as $111,-221.30. However, this sum was reduced by 10% because the court determined that 10% of the attorney fees and other expenses were expended on Medtronic's tortious interference claim against Angeion. The court deducted an additional $6,246.25 after deter-

---

**3.** The outside counsel contacted by Angeion on this issue is not the same counsel that represents Angeion in this case.

mining that Medtronic incurred these fees before Kallok's employment with Angeion. Thus, for purposes of this appeal, Medtronic's $93,852.92 damage award only includes Medtronic's attorney fees and other expenses incurred in connection with its litigation against Kallok.

The court of appeals affirmed the district court's grant of an injunction prohibiting Kallok from working for Angeion for one year, but the court of appeals reversed the district court's tortious interference conclusion by holding that Minnesota courts "have been loathe [sic] to recognize liability for the tortious interference of a contract in the employment noncompete agreement realm." Consequently, the court of appeals reversed the award of damages to Medtronic. On appeal to our court, Medtronic argues that Minnesota law allows recovery of damages caused by a third party's interference with noncompete employment agreements. Further, Medtronic claims it is entitled to recover the attorney fees and other expenses it incurred in its litigation with Kallok as the measure of damages resulting from Angeion's tortious interference with Medtronic's noncompete agreements with Kallok.

## I.

■ Medtronic contends that the court of appeals disregarded established Minnesota law by holding that recovery for tortious interference with a valid employment noncompete agreement is not warranted. We agree with Medtronic's contention. While we have not previously decided this specific issue, a well-established body of law dictates the conclusion that a third party's interference with a noncompete agreement is a tort for which damages are recoverable.

■ In Minnesota, employment noncompete agreements "are looked upon with disfavor, cautiously considered, and carefully scrutinized." *Bennett v. Storz Broadcasting Co.*, 270 Minn. 525, 533, 134 N.W.2d 892, 898 (1965) (citation omitted). However, noncompete agreements are enforceable if they serve a legitimate employer interest and are not broader than necessary to protect this interest. *Walker Employment Serv., Inc. v. Parkhurst*, 300 Minn. 264, 271, 219 N.W.2d 437, 441 (1974); *Bennett*, 270 Minn. at 533, 134 N.W.2d at 898. In determining whether to enforce a particular noncompete agreement or provision, the court balances the employer's interest in protection from unfair competition against the employee's right to earn a livelihood. *Walker Employment*, 300 Minn. at 271, 219 N.W.2d at 441; *see also Bennett*, 270 Minn. at 536, 134 N.W.2d at 899–900. If the employer's interest predominates, the noncompete agreement is valid and enforceable. *See, e.g., Alside, Inc. v. Larson*, 300 Minn. 285, 220 N.W.2d 274, 279–80 (1974).

■ It is well-established that a third party who interferes with and causes the breach of a contract may be held liable for damages. We have held that "[t]he intentional procurement of the breach of an existent contract, without just cause or excuse, makes him who causes the breach liable for resulting damages." *Sorenson v. Chevrolet Motor Co.*, 171 Minn. 260, 266, 214 N.W. 754, 756 (1927); *see also Nordling v. Northern States Power Co.*, 478 N.W.2d 498, 505 (Minn.1991) (holding that third party "meddlers" should not be permitted to interfere with an at-will employment agreement). Once a party to a contract has established that tortious interference by a third party has occurred, the courts may hold that third party liable for any resulting damages as well as grant necessary injunctive relief. *See Kjesbo v. Ricks*, 517 N.W.2d 585, 591 (Minn.1994). These remedies can protect an employer's investment in its business by decreasing the risk that confidential proprietary information it developed will be plundered through tortious employee raids.

If we take the reasoning used when there has been third-party interference with a contract and apply this reasoning to situations where there has been interference with a valid noncompete agreement, the logical result is that third-party interference with the noncompete agreement is a tort for which damages are recoverable. We have already implicitly adopted this position. In *Cherne Industrial, Inc. v. Grounds & Assoc., Inc.*, this court affirmed a district court's tort judgment against a competitor that had interfered with a rival company's valid noncom-

pete agreement. *See* 278 N.W.2d 81 (Minn. 1979). We noted in *Cherne* that if a court concludes that an employer's noncompete agreement is reasonable, the employer is entitled to protect its rights under the noncompete agreement. *Id.* at 88 n. 2. This protection includes the right to recover damages. Accordingly, we hold that if a noncompete agreement is deemed valid and if the elements of tortious interference are established, interference with the noncompete agreement by a third party is a tort for which damages are recoverable.

## II.

■ Having concluded that interference with a valid noncompete agreement by a third party is a tort for which damages are recoverable, we next examine whether the district court was correct in concluding that Medtronic had established the elements necessary to sustain its cause of action for tortious interference. A cause of action for tortious interference with a contractual relationship requires five elements: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Kjesbo*, 517 N.W.2d at 588 (further citation omitted). The district court found that Medtronic established all five requisites of tortious interference.

Medtronic easily established the first three *Kjesbo* elements. First, as Kallok signed valid noncompete agreements, it is evident that a contract existed between him and Medtronic. Second, Angeion knew of the existence of Kallok's noncompete agreements before it hired him. Kallok told McFarlin that he might be subject to the agreements and McFarlin, as a former Medtronic executive, had been subject to the same agreements and assumed that Kallok was subject to similar agreements. Third, the record demonstrates that Angeion officials met with Kallok on numerous occasions and procured the breach of his noncompete agreements by offering him the vice president position that he eventually accepted.

■ To establish the fourth *Kjesbo* element, Medtronic must prove that Angeion's

interference with its contractual relationship with Kallok was not justified. Whether interference is justified is ordinarily a factual determination of what is reasonable conduct under the circumstances. *Id.* The burden of proving justification is on the defendant. *Id.* The district court concluded that "Angeion tortiously induced Kallok to breach his [noncompete agreements] without justification." Angeion, however, asserts that it went out of its way to act in good faith and that its actions were justified because it consulted with its outside legal counsel before hiring Kallok and took the initiative to seek judicial review. We conclude that Angeion's argument lacks merit.

■ Tortious interference is not justified when a plaintiff demonstrates that the "defendant had knowledge of facts which, if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and rights of the parties." *Swaney v. Crawley*, 154 Minn. 263, 265, 191 N.W. 583, 584 (1923) (citation omitted); *see also Twitchell v. Nelson*, 131 Minn. 375, 381, 155 N.W. 621, 622 (1915) (holding that the law will impute bad faith when the wrongdoer has knowledge that the contract existed). Even though Angeion consulted with its outside counsel about Kallok's noncompete agreements, Angeion did not fully inform its outside counsel about Kallok's background at Medtronic or the intricacies of his noncompete agreements. Had Angeion candidly provided its attorneys with all relevant information and enabled them to thoroughly review Kallok's position and responsibilities at Medtronic, including his access to confidential information, in all likelihood Angeion would have understood that hiring Kallok would cause him to breach his noncompete agreements with Medtronic. Angeion may not rely upon an infirm consultation with counsel and the resulting advice as a justification for its action. *See Twitchell*, 131 Minn. at 381–82, 155 N.W. at 624. We conclude Angeion did not utilize a reasonable inquiry in ascertaining whether Kallok's noncompete agreements with Medtronic prevented him from being employed by Angeion. Therefore, the district court properly concluded that Angeion's procurement of Kal-

lok's breach of his noncompete agreements was without justification.

The fifth and final *Kjesbo* element necessary to establish a tortious interference claim is pecuniary damages. The district court concluded that Medtronic incurred pecuniary damages because it incurred attorney fees and other expenses in its litigation against Kallok. Consequently, the court awarded Medtronic damages in the amount of these attorney fees and other expenses. Angeion contends that the court erred because Medtronic did not suffer any damages and, in particular, Medtronic is not entitled to damages under the American rule that bars a litigant from recovering attorney fees and other litigation expenses.

The American rule prevents a party from shifting its attorney fees to its adversary without a specific contract or statutory authorization. *Barr/Nelson, Inc. v. Tonto's, Inc.*, 336 N.W.2d 46, 53 (Minn.1983); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 271, 95 S.Ct. 1612, 1628, 44 L.Ed.2d 141 (1975) (declining to invade the legislature's province and award attorney fees without statutory authorization). However, the third-party litigation exception to the American rule permits a court to award attorney fees as damages if the defendant's tortious act thrusts or projects the plaintiff into litigation with a third party. *Langeland v. Farmers State Bank*, 319 N.W.2d 26, 33 (Minn.1982); *Prior Lake State Bank v. Groth*, 259 Minn. 495, 500, 108 N.W.2d 619, 622 (1961); *Tarnowski v. Resop*, 236 Minn. 33, 39–40, 51 N.W.2d 801, 804 (1952); *Bergquist v. Kreidler*, 158 Minn. 127, 130, 196 N.W. 964, 965 (1924).

Our decision in *Groth* discusses the third-party litigation exception to the American rule. In *Groth*, an audit revealed shortages in the plaintiff bank that were subsequently traced to a misappropriation by the defendant Groth. *Groth*, 259 Minn. at 496, 108 N.W.2d at 620. After a third-party surety company denied liability for the bank's losses, the bank brought an action against the defendant for the expenses the bank incurred in pursuing a claim against the surety company. *Id.* at 496–97, 108 N.W.2d at 620–21. We determined that the defendant's tortious actions "projected" the plaintiff into litigation against the third-party surety company and we held that the bank was entitled to recover from the defendant as damages the amount of attorney fees and other expenses it incurred in connection with its litigation against the third party. *Id.* at 500–01, 108 N.W.2d at 623. We stated:

> It is well settled that a person injured by the tortious conduct of another is entitled to recover from the other damages for all harm, past, present, and prospective, legally caused by the tort. * * * Likewise, where the natural and proximate consequence of a person's tortious act projects another into litigation with a third person, *attorneys' fees and expenses reasonably incurred by the injured party in such litigation may be recovered from the one guilty of the tortious conduct.*

*Id.* at 499, 108 N.W.2d at 622 (citations omitted) (emphasis added).

Medtronic asserts that the third-party litigation exception applies in this case because Angeion's tortious interference with its noncompete agreements with Kallok directly caused Medtronic to enter litigation against Kallok to protect its rights under the noncompete agreements. Although this court has always been exceedingly cautious when awarding attorney fees as damages, we find Medtronic's argument to be persuasive and supported by the evidence. As Medtronic demonstrated, Angeion tortiously interfered with Kallok's noncompete agreements with Medtronic without justification. As a result, Medtronic was forced into court to protect the legitimate interest embodied in Kallok's noncompete agreements. Only after extensive litigation was Medtronic successful in obtaining an injunction that prevented Kallok from working for Angeion for one year. It is undeniable that but for Angeion's tortious actions, Medtronic would not have had to enforce its valid noncompete agreements with Kallok. Here, as in *Groth*, Medtronic meets both the requirement that the third party commit a tort and the causal requirement of the third-party litigation exception to the American rule. We hold that the district court properly applied the third-party exception to the American rule and correctly al-

lowed Medtronic to recover from Angeion the attorney fees and other expenses it incurred in enforcing its noncompete agreements with Kallok.

Reversed.

PAGE, J., took no part in the consideration or decision of this case.