Gants, J.
The plaintiff, American Express Financial Advisors Inc. (“American Express”), has moved for a preliminary injunction to enforce a restrictive covenant barring its former independent contractors, the defendants Joeann Walker, Steven Healey, and Michael Riccio, from, among other restrictions, accepting any business for a period of one year from the clients they had when they were affiliated with American Express. This Court, after the initial hearing on September 14, 1998, granted a limited Temporary Restraining Order barring the plaintiffs from soliciting business from their former American Express clients pending this decision. For the reasons stated below, American Express’s motion for a preliminary injunction is ALLOWED in part and DENIED in part, and the Temporary Restraining Order is hereby DISSOLVED in favor of the instant Order.
FINDINGS OF FACT
“By definition, a preliminary injunction must be granted or denied after an abbreviated presentation of the facts and the law.” Packaging Industr. Group, Inc. v. Cheney, 380 Mass. 609, 616 (1980). The preliminary findings of fact below are based on the verified complaint and the many affidavits and attached exhibits furnished by the parties.
American Express, formerly known as IDS Financial Services Inc. (“IDS”), is a broker-dealer providing a variety of financial services to persons and entities throughout the nation. When a potential client comes to American Express in search of financial planning services, it will direct that person to a Personal Financial Advisor, who will assess that person’s current financial situation and future needs, recommend a personal financial plan, and assist in implementing that plan by investing in approved American Express investments, insurance policies, and annuities. The Personal Financial Advisor is an employee of American Express until the completion of an initial training period and then becomes an independent contractor of American Express, authorized to use American Express’s trade name and paid on commission based on the volume of clients’ investments in American Express investment vehicles.
The three defendants each were Personal Financial Advisors with American Express until they resigned in the summer of 1998. Walker and Healey resigned on or about July 2, 1998, went into business together as Walker and Healey Financial Services, and became representatives of another broker-dealer — Commonwealth Equity Services. Riccio resigned roughly one month later — on or about August 11, 1998 — and also became a representative of Commonwealth Equity Services.
All of them had been Personal Financial Advisors affiliated with American Express for no less than three years and had joined when American Express was using the IDS name;[1] Walker became an Advisor on or about August 19, 1992, Healey on or about November 15, 1989, and Riccio on or about June 7, 1995. All had college degrees and outside work experience, but none had any significant background or training in financial services or planning.
The three defendants, as a condition of participating in American Express’s training program, each executed identical Planner Candidate Disclosures. In these Disclosures, the defendants indicated their understanding that, if American Express were to appoint them as financial planners (which American Express did not thereby promise to do), they “will sign Personal Financial Planner Agreements with IDS, which include non-competition clauses, in which, among other things, I promise that if my association with IDS ends, I will not solicit or sell insurance and/or securities products to IDS clients for one year after I leave IDS.”
*243 Each defendant successfully completed the training program and was appointed an IDS financial planner pursuant to a Personal Financial Planner’s Agreement (“Planner’s Agreement”). The defendants’ execution of this Agreement, like the Planner Candidate Disclosure, was a required condition of their affiliation with American Express; it was not subject to negotiation or revision. In short, the defendants effectively were given the choice of signing these Agreements as is or looking elsewhere for work.
Under the Planner’s Agreement, the defendants were employees of American Express only during their training period, which lasted roughly one year. When their training period ended, they were affiliated with American Express only as independent contractors, notas employees.[2] As independent contractors, under the Planner’s Agreement, “You decide whom to choose as business prospects and when and where to conduct your working activities.” Yet, each financial planner had to agree to certain ethical conditions in their dealings with clients and prospective clients, including promising to “explain the terms of Products or Services fully; make no untrue statements; and state all relevant facts.”
Under the portion of the Agreement entitled, “Restrictions on Your Activities,” the defendants were prohibited from engaging in certain activities for a period of one year after the termination of the Agreement and other activities were forever barred. For one year after the Agreement ended, the Agreement provided:
[Y]ou agree that you will not, in the territory where you sought applications for Products or Services under this or any other agreement with IDS or an Affiliate, directly or indirectly offer for sale, sell or seek an application for any Product or Service issued or provided by any company to or from a Client you contacted, dealt with or learned about while you represented IDS or an Affiliate or Issuer or because of that representation (Section IV(l)(g)); and
[Y]ou agree not to use any [information regarding the identity of Clients and potential Clients] in connection with any business in competition with IDS or an Affiliate or Issuer. (Section IV(l)(f)).[3]
The Agreement forever prohibited the defendants, without the written consent of IDS, from:
using “any information you acquired while this Agreement was in force in a manner adverse to the interests of IDS, an Affiliate, or an Issuer” (Section IV(l)(a));
encouraging or inducing anyone “to terminate an agreement with IDS, an Affiliate or Issuer without IDS’ consent” (Section IV(l)(a)(l));
encouraging or inducing “any Client to stop carrying out any action related to a Product or Service it acquired from or through IDS” (Section IV(l)(a)(2)); encouraging or inducing “any Client to sell, surrender or redeem any Product or Service distributed or offered by IDS or an Affiliate” (Section IV(l)(a)(4));
revealing “the names and addresses of IDS Clients or any other information about them, including financial information” (Section IV(l)(e)); and
doing “anything to damage the goodwill of IDS, an Affiliate or Issuer.” (Section V(5)).
The Agreement further provided that it was a Minnesota contract, governed by Minnesota law. All disputes regarding the Agreement are to be submitted for arbitration, but the Agreement specifically preserves American Express’s right to seek an injunction from a court while the arbitration is pending.
The defendants gave no advance notice to American Express of their intentions to terminate the Planner’s Agreement, in violation of that Agreement which obliged them to give American Express fifteen days written notice of their resignation. On or about their last day affiliated with American Express, they sent their respective clients nearly identical letters informing the clients that they had decided to accept a position with Commonwealth Equity Services, Inc., effective that same day, and that they were excited about this new opportunity “to offer clients a large variety of quality financial services and products.” The letter thanked the clients for the confidence they had placed in them. It continued:
American Express Financial Advisors will in the immediate future assign your business to another of its financial advisors if you desire to continue to keep your business with the company. Obviously, I would welcome the opportunity to serve your future financial advisory and investment needs. Because of certain non-compete restrictions, however, I am unable for now to solicit your business in competition with American Express Financial Advisors. Nonetheless, who you choose to do business with, including me, is your decision not mine or theirs.
The letter gave the defendant’s new work address and telephone number. In capital letters, the letter declared below the signature:
THIS LETTER IS NOT INTENDED TO BE AND SHOULD NOT BE CONSTRUED TO BE A SOLICITATION OF YOUR FUTURE BUSINESS.
Apart from the solicitation implicit in this letter, American Express has been unable to present persuasive evidence that the defendants have initiated contact with their American Express clients or otherwise solicited their business. It is undisputed that a number of these clients have transferred their American Express accounts, worth millions of dollars, to Commonwealth Equity Services in order to continue to receive financial planning from the defendants. Yet, American Express has presented no evidence to contradict the substantial evidence presented by the de *244 fendants that these clients have transferred their investment monies on their own initiative based, to varying degrees, on their satisfaction with the financial advice and attention they had received from the defendants and their dissatisfaction with the financial advice and inattention they believed they were receiving from their successors at American Express.[4]
CONCLUSIONS OF LAW
In determining whether to grant a preliminary injunction, this Court must perform the three-part balancing test articulated in Packaging Industr. Group, Inc. v. Cheney, 380 Mass. at 616-17. First, the court must evaluate the moving party’s claim of injury and its likelihood of success on the merits. Id. at 617. Second, it must determine whether failing to issue a preliminary injunction would subject the moving party to irreparable injury — losses that cannot be repaired or adequately compensated upon final judgment. Id. at 617 n.11. Third, ”[i]f the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing parly.” Id. at 617. In balancing these factors, “[w]hat matters as to each parly is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party may a preliminaiy injunction properly issue." Id. “In an appropriate case, the risk of harm to the public interest also may be considered.” GTE Products Corp. v. Stewart, 414 Mass. 721, 723 (1993), quoting Brookline v. Goldstein, 388 Mass. 443, 447 (1983).
I. The Enforceability of the Restrictive Covenants in the Planner’s Agreement
Under the Planner’s Agreement, Minnesota’s substantive law must govern this decision.[5] Since Minnesota courts generally look upon covenants not to compete with “disfavor,” Overholt Crop Ins. Serv. Co., Inc. v. Bredeson, 437 N.W.2d 698, 703 (Minn.Ct.App. 1989), I must first examine whether it is likely that American Express will be able to prevail on the merits and enforce such a provision.
“Under Minnesota law, a restrictive covenant is unenforceable if the restraint is not necessary for the protection of the business or goodwill of the employer, or if the restraint imposed upon the employee is broader than necessary to protect the employer’s legitimate business interest.” Medtronic, Inc. v. Gibbons, 527 F.Supp. 1085, 1094 (D.Minn. 1981), aff'd, 684 F.2d 565 (8th Cir. 1982). See also Kallok v. Medtronic, Inc., 573 N.W.2d 356, 361 (Minn. 1998); Walker Employment Serv. v. Parkhurst, 219 N.W.2d 437, 441 (Minn. 1974); Bennett v. Storz Broadcasting Co., 134 N.W.2d 892, 899 (Minn. 1965). Minnesota courts will uphold a covenant not to compete if it is “for a just and honest purpose, for the legitimate interest of the party in whose favor it is imposed, reasonable as between parties, and not injurious to the public.”[6] Walker Employment Serv. v. Parkhurst, 219 N.W.2d at 441, quoting Bennett v. Storz Broadcasting Co., supra.
American Express argues that its restrictive covenant is limited in time to one year and in scope to clients of the departing financial advisor, and is reasonably designed to protect American Express’s legitimate interest in keeping its clients, protecting confidential information regarding the names and addresses of clients and prospective clients, and preserving its goodwill. The defendants argue that the Planner’s Agreement they signed which contained the non-compete provisions was given to them when they first began their employment with American Express without adequate explanation or advice, and with no opportunity to negotiate or otherwise revise its terms. They insist that, as an adhesion contract, it should not be enforced. Moreover, they contend that the goodwill built with their clients was earned from their work, not the institutional support provided by American Express, and therefore properly belongs to them. They note that the non-compete provisions injure those former clients who have come to rely upon them for financial advice and now are barred for one year from seeking that advice. While they contend that all the restrictive covenants in the Planner’s Agreement are overbroad and unenforceable, they direct their aim primarily at the provisions that bar them from doing business with any of their former clients for one year.
The Planner’s Agreement is certainly an adhesion contract. The defendants had no opportunity to negotiate its terms; they could sign it and accept the terms set forth by American Express as is, or look elsewhere for work. Yet, the fact that it was an adhesion contract does not mean that it is unenforceable per se; it simply means that this Court must scrutinize the Agreement more closely to determine whether it is unconscionable, offends public policy, or is unfair under the circumstances. Chase Commercial Corp. v. Owen, 32 Mass.App.Ct. 248, 253 (1992); see also Restatement (Second) of Contracts §211 (1979); Kroeger v. Stop & Shop Cos., 13 Mass.App.Ct. 310, 318-19 (1982).
In evaluating the enforceability of a covenant not to compete, I must weigh the various interests at stake. See Kallok v. Medtronic, Inc., 573 N.W.2d at 361; Merrill Lynch, Pierce, Fenner & Smith, Inc. v. de Liniere, 572 F.Supp. 246, 249 (N.D. Ga. 1983); Minet Ins. Brokers, Inc. v. Rooney, Civil No. 97-0675-C at 4 (Suffolk Super. Ct. Feb. 14, 1997) (J. Hinkle). American Express’s primary justification for barring its former financial advisors for one year from all dealings with their American Express clients is that such a blanket prohibition is necessary to protect its goodwill. Goodwill encompasses a variety of intangible business attributes that tends to enable a business to retain its customers. McFarland v. Schneider, Civil No. 96-7097 *245 at 108 (Middlesex Super. Ct. Feb. 17, 1998) (J. McHugh). See also Slate Co. v. Bikash, 343 Mass. 172, 175-76 (1961). Stripped to its core, when American Express states that it wishes to preserve its goodwill, it means that it wants to prevent its clients (and their investments) from leaving American Express with their financial advisors and transferring their investments with them. To examine whether this interest is legitimate under the circumstances found here, I must first examine what American Express does for its clients, what share of that is performed by its financial advisors, and how its advisors interact with American Express. See generally McFarland v. Schneider, supra at 109-12.
When American Express offers financial planning services to its clients, it really is offering three kinds of benefits. First, it offers a range of investment and insurance products that are available only through its financial advisors. Second, it offers investment information and analysis that is generally gathered and conducted by its “back-room” employees and furnished to the financial advisors who have direct contact with its clients. Third, it offers the financial planning and investment advice of its financial advisors, supported by the training and supervision provided to them by American Express. As a result, there is a “symbiotic relationship” between American Express and its financial advisors. See Medtronic, Inc. v. Gibbons, 527 F.Supp. at 1091. Financial advisors will look good to their clients only if the clients’ portfolios prosper, and those portfolios will not prosper unless the information and analysis furnished to the financial advisors by American Express is sound and the investment vehicles offered by American Express perform as promised. Similarly, American Express, no matter how effective its “back room” operations are and how much its investment vehicles out-perform the market, will not have loyal clients unless those clients are satisfied with the advice, attention and “bedside manner” of their financial advisor.
When financial advisors leave American Express, they carry with them only the third type of benefit; they leave behind the informational and analytical support they had previously obtained from American Express’s “back room” operations and the investment products that American Express had to offer. Indeed, even this third type of benefit may not be the same, because the advisors have also lost the continuing training and supervisory support that American Express may have furnished. Yet, to a client, the financial advisor may have become the embodiment of American Express since all that American Express had to offer appeared to emanate from the financial advisor. Indeed, American Express expressly encouraged its planners to develop this type of close one-to-one relationship with its clients, because it recognized that loyally to an institution is more likely when there is loyalty to a person affiliated with that institution. Because its goodwill is inextricably interwoven with that of its financial advisors,. American Express properly may fear that its goodwill will travel with their financial advisors when they leave American Express. Therefore, it has a legitimate business interest in protecting the client goodwill it creates for its financial advisors. See Medtronic, Inc. v. Gibbons, supra at 1091; Walker Employment Serv., Inc. v. Parkhurst, supra at 440; McFarland v. Schneider, supra at 109-10.
Yet, more than American Express’s legitimate interests are at stake when it imposes a restrictive covenant that bars its financial advisors from doing business with its clients for one year: by restricting whom its former financial advisors may deal with for one year, it is also restricting whom its current clients may deal with for one year. In short, this covenant bars American Express’s clients from transferring its funds into the care of the defendants even when its clients may decide, intelligently and rationally, that this is what they want to do with the money they devoted a lifetime to earning. Indeed, although American Express declares that it does not want its restrictive covenant enforced to this degree, the Planner’s Agreement by its terms would bar a defendant’s mother, if she had become her child’s client at American Express, from transferring her funds to her child’s new broker-dealer.
This restriction on the ability of its clients to obtain advice from the advisor of their choice would be more palatable if American Express had informed its clients, when they signed on with American Express, that they would not be able to remain with their financial advisor if the advisor were to leave American Express. Yet, it is plain that American Express did not provide clients with this warning, or give them any information from which they could have inferred this consequence. Here, through affidavits and letters, some of the defendants’ former clients have attested, quite passionately, to their desire to remain the clients of the defendants and to their outrage at the possibility that American Express, through an agreement of which they had no knowledge, may prevent them from receiving the investment advice and support they want and need.
In considering the competing interests of American Express and their clients, I note that, as a broker-dealer, American Express has a fiduciary duty to protect the interests of its clients, and its financial advisors share a similar fiduciary duty. See Berenson v. Nirenstein, 326 Mass. 285, 288-89 (1950) (fiduciary obligation of brokers to their clients “rests upon fundamental principles of business morality and honor which are of the highest public interest, and which it is the bounden duty of courts to preserve unimpaired”); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. de Liniere, 572 F.Supp. at 249 (“fiduciary duties of a broker are recognized in law because of the important role of the broker in protecting the financial welfare of *246 his clients”). See also Client Relations Guide, 1998 Edition for American Express Financial Advisors and Managers at 7 (“At American Express Financial Advisors (AEFA) all of our activities and decisions are guided by the American Express Corporate Values: Placing the interest of the Clients first . . .”) The Planner’s Agreement in part reflected this obligation when it required the defendants, in dealing with clients, to "explain the terms of Products or Services fully; make no untrue statements; and state all relevant facts.” Yet, neither American Express nor its financial advisors informed their clients, as the advisors were consciously cultivating a one-on-one relationship with them, that the relationship with the advisor must take a one year sabbatical if the advisor were to leave American Express. One can understand why American Express did not want to notify its clients of this information, but it must understand that there are consequences to its silence on this issue.[7]
Moreover, in balancing these competing interests, I recognize that the relationship between a financial advisor and an individual client is not the same as between a salesperson and a client, or even between a financial advisor and a pension fund or other such institution. Compare Merrill Lynch, Pierce, Fenner & Smith, Inc. v. de Liniere, 572 F.Supp. at 249 (“[a] stock broker stands in a different relationship to his customers from that of other kinds of salesmen”) with Medtronic, Inc. v. Gibbons, 527 F.Supp. at 1091 (pacemaker sales representative), and McFarland v. Schneider, supra at 115-16 (portfolio manager for institutional investors). The job of a financial advisor, as described by American Express in its Verified Complaint, is to work with clients on a “one-to-one basis to help them identify their most important financial goals and establish and implement their financial plans . . .” In performing this job, a financial advisor learns from clients what they own, what matters to them in life (at least financially), what they are prepared to risk, and what they hope to accomplish with their money. Once a plan is established that accords with the client’s means, needs, and desires, the client essentially entrusts all or a part of his life’s savings to the financial advisor for the advisor to invest. While the relationship may not be as intimate as that of a doctor and patient or attorney and client and, unlike those professions, is not specifically protected from non-compete agreements in this Commonwealth by statute or Supreme Judicial Court rule, it is plainly a valuable and important personal and financial relationship whose significance, in the context of a particular case, the common law should not categorically ignore. See Prudential Servs., Inc. v. Plunkett, 8 F.Supp.2d 514, 520 (E.D. Va. 1998) (because relationship between financial advisor and client is, like a doctor-patient or lawyer-client relationship, dependent on personal trust, client should be free to choose own advisor). Compare G.L.c. 112, §§12X, 74D (1983) (prohibiting non-compete restrictions on the right of doctors and nurses to practice); S.J.C. Rule 3:07, RPC 5.6 (prohibiting non-compete restrictions on the right of lawyers to practice).
Having considered the legitimate interests of American Express in addition to the interests of its clients and the general public, I find that it is reasonable for American Express to attempt to protect its goodwill and its confidential information regarding the identities of present and prospective clients through some form of restrictive covenant. Some period of time of noncompetition is needed to permit American Express to replace the departing financial advisor with another advisor, to permit that person to establish a relationship of trust and confidence with clients, and to allow American Express to demonstrate to its clients that the goodwill generated by the departing financial ad-visor was attributable more to American Express than to the particular skills of that individual. That period of time, however, should not be so great as to unfairly restrict American Express’s clients from investing their life’s' savings with the departing financial advisor’s new broker-dealer, if they are convinced after a decent interval that this is what they want to do. I conclude that the one year prohibition in the Planner’s Agreement is an unreasonably long time to interfere with American Express clients’ legitimate interests in investing their money with whom they want. On balance, I find that a four month prohibition is the longest period of time reasonable for a blanket prohibition against a financial advisor doing business with a former client when that client had not been previously advised of the existence of such a prohibition. Four months is long enough for American Express to assign a replacement financial advisor and permit that advisor to demonstrate to her new clients her competence and concern, but not so long (in most economic circumstances) that it will unduly damage the client to sit tight with American Express and be denied the planning and investment advice of his former financial advisor.[8]
While a one year blanket prohibition of all business dealings between a financial advisor and her client is unreasonably long, a one year prohibition of solicitation is not unreasonably long. Although American Express’s legitimate interest in preserving its goodwill may need somewhat to give way to protect its clients’ ability to invest with whom they want, this does not mean that its former financial advisors should be entitled to entice its clients away by soliciting their business. If a client, after four months have passed, decides on his own initiative that he wants to leave American Express and become a client of his former financial advisor now affiliated with a different broker-dealer, he should be allowed to do so, but it is reasonable for American Express contractually to oblige its financial advisors to wait at least one year after their termination before they are allowed to solicit that client’s business.
*247 I have considered whether it would make more sense to enforce only the longer, one year bar on solicitation and not the shorter, four month blanket bar on all business dealings with American Express clients — in other words, to let clients follow the defendants if they wish but prohibit the defendants from encouraging them. I decide against such a resolution for two reasons. First, as stated earlier, since the financial advisor has the direct relationship with the client and thereby personifies to the client all the benefits that American Express can provide to the client, barring the financial advisor only from solicitation would give inadequate protection to the goodwill fairly created by American Express. Clients naturally may tend to follow the person they know and have come to trust. Second, while it may not be difficult to identify aggressive solicitation, it is quite difficult to identify .and sanction more subtle forms of it. Indeed, in this case, the farewell letter of the defendants to their American Express clients, although it declared in capital letters that it was not intended to be and should not be construed to be a solicitation of the clients’ business, certainly would be understood as inviting clients to take the initiative to transfer their investments in order to continue to be advised by them. The letter said that the defendant could not solicit their business but would welcome the opportunity to continue to serve their financial advisory and investment needs. It then observed that the choice of financial advisors was the client’s decision, and later gave the defendant’s new address and telephone number. If solicitation were all that was prohibited, financial advisors could too easily seek to circumvent the restrictions by dropping hints more subtle than these.[9]
Some of the restrictions in the Planner’s Agreement that are to endure forever do not survive scrutiny regarding their reasonableness and may not be enforced, at least as drafted. Even under the Agreement, the defendants are entitled to provide financial planning services to their former American Express clients after more than a year has passed since their termination from American Express. It is unreasonable, given the fiduciary obligations that they will then owe to their clients, to restrict the advice they may give regarding their clients’ continued investment in American Express products. It may be in their client’s best interests to advise them to disinvest in an American Express investment vehicle dr to withdraw from an American Express life insurance plan. They should not be barred by their prior contractual commitments with American Express from serving their new clients, even if that advice may be adverse to the interests of American Express. Consequently, I find that the following prohibitions in the Planner’s Agreements are unreasonable and unenforceable to the extent they limit the ability of the defendants from providing the best possible financial advice to persons who have become or lawfully will become their clients:
using “any information you acquired while this Agreement was in force in a manner adverse to the interests of IDS, an Affiliate, or an Issuer" (Section IV(lHa));
encouraging or inducing anyone “to terminate an agreement with IDS, an Affiliate or Issuer without IDS’ consent” (Section IV(l)(a)(l));
encouraging or inducing “any Client to stop carrying out any action related to a Product or Service it acquired from or through IDS” (Section IV(l)(a)(2)); and
encouraging or inducing “any Client to sell, surrender or redeem any Product or Service distributed or offered by IDS or an Affiliate" (Section IV(l)(a)(4)).
I recognize that, in finding unenforceable the Planner’s Agreement’s one year blanket prohibition on doing business with clients and its permanent restrictions beyond one year regarding the advice financial advisors may provide to their own clients, I am differing from certain other courts that have upheld the Planner’s Agreement against similar challenges. See, e.g., American Express Financial Advisors v. Theis, Civil No. C8-95-2811 (Minn. Dist. Ct. Nov. 29, 1995); IDS Financial Corp. v. Dube, Civil No. 92-0530 (Mass. Super. Ct. May 22, 1992); New Boston Select Group, Inc. v. Ristaino, Civil No. 96-1238 (Mass. Super. Ct. March 7, 1996); American Express Financial Advisors v. Fury, Civil No. C8-95-1032 (N.D. Iowa Nov. 22, 1995). I note, however, that some of these courts only issued an order prohibiting future solicitation, and did not bar for one year all financial dealings by financial advisors with their former clients. See American Express Financial Advisors v. Theis, supra; American Express Financial Advisors v. Fury, supra; New Boston Select Group, Inc. v. Ristaino, supra. In those cases where the one year blanket prohibition was enforced, few of these courts addressed head-on the impact such an order would have on those American Express clients who wanted to transfer their accounts to the departing financial advisor. See IDS Financial Corp. v. Dube, supra (no discussion of impact on clients); IDS Financial Servs, Inc. v. Musumeci, Civil No. 9402566 (D.N.J. July 12, 1994) (noting only that customers may seek advice from other financial planners); American Express Financial Advisors v. Hughes, Civil No. CV 98-2273-TUC-WDB (D.Ariz. June 10, 1998) (no discussion of impact on clients); American Express Financial Advisors v. Knox, Civil No. 98-0615-BH-C (S.D. Ala. July 23, 1998) (noting absence of testimony that clients would suffer any economic loss). When this consideration was carefully examined in similar contexts, it was deemed important enough to cause the court to deny injunctive relief to enforce the covenants not to compete. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. de Liniere, 572 F.Supp. at 249; Minet Ins. Brokers, Inc. v. Rooney, supra at 4.
*248 II. The Appropriateness of a Preliminary Injunction
The above findings regarding the likelihood that American Express will be able ultimately to enforce the restrictive covenants in the Planner’s Agreement affect, but do not necessarily determine, my decision as to whether a preliminary injunction should issue. As stated above, I must also examine whether American Express would suffer irreparable injury if I fail to issue a preliminary injunction and then balance this risk against the risk that the defendants would suffer irreparable injury from such an injunction. See infra at 6-7.
The defendants contend that, even if a breach of the restrictive covenant were shown, no injunction is warranted because no irreparable harm can be shown. Under Minnesota law, however, the threat of irreparable harm can be inferred from a breach of a valid restrictive covenant. Medtronic, Inc. v. Gibbons, 527 F.Supp. at 1091-92, and cases cited. Even if irreparable harm were not inferred as a matter of law, there is sufficient evidence to support American Express’s contention of irreparable injury. The loss of goodwill, by its nature, is difficult to identify and measure, as are the money damages resulting from the loss of clients. Id. at 1091-92. I find that American Express has met its burden of establishing irreparable harm if an injunction is not issued.
I also find that the issuance of a preliminary injunction barring the defendants from doing any business with former clients for four months and from soliciting clients for one year would do irreparable injury to the defendants, since their American Express clients are the defendants’ natural client base.[10] See Merrill Lynch,Pierce, Fenner & Smith, Inc. v. de Liniere, 572 F.Supp. at 249 (injunction would leave broker “with no client base in a business that thrives on commissions from regular clients”). The irreparable injury would be far greater if the injunction forced the defendants to relinquish existing clients who had followed them from American Express. Those clients who transferred their funds from American Express already have had to pay substantial surrender charges as a result of this transfer, and would likely pay additional surrender charges if they now transferred their assets from Commonwealth. They would be unlikely to risk even greater surrender charges by returning to the defendants and Commonwealth after the time bar elapsed. Moreover, it would be an even greater hardship on the clients to oblige them to transfer these funds back to American Express, whom they do not want to handle their investments, and incur additional surrender charges from Commonwealth in doing so.
Balancing these competing risks of irreparable injury, this Court shall enforce through a preliminary injunction the four month blanket prohibition on dealing with former clients and the one year ban on solicitation, but it shall not order the defendants to transfer the accounts of those American Express clients who have already joined the defendants prior to this Order. Ordering the defendants to relinquish these accounts and transfer them back to American Express may help to put American Express back to where it was before the defendants’ violation of the blanket prohibition of the Planner’s Agreements, but it would impose undue hardship on the defendants and unfair hardship on their former American Express clients. Consequently, the preliminary injunction shall apply only to the acceptance and solicitation of new business by the defendants, not to the maintenance of current client accounts. This Court also shall enforce through a preliminary injunction for a period of one year the prohibition on the use of confidential information, which the defendants do not contend would pose a hardship for them or their clients.[11]
ORDER
This Court hereby preliminarily enjoins the defendants, Joeann M. Walker and Steven T. Healey, individually and doing business as Walker and Healey Financial Services, as follows:
1. With respect to any persons or entities whom Walker or Healey served while representing American Express and for whom neither is the financial advisor nor registered representative as a representative of any broker-dealer other than American Express (“Non-Clients”), Walker and Healey are preliminarily enjoined:
a. until November 2, 1998, from directly or indirectly offering for sale, selling, or seeking an application for any Products (defined as certificates, stock, other securities or investments, lending products, life insurance and annuity policies and contracts, and other insurance products) or Services (defined as financial planning, advisory, securities brokerage, tax, or other financial services);
b. until July 2, 1999, from soliciting[12] any Non-Clients (a) to do financial services business with, or to become clients of, them or any broker-dealer with which they sire associated, or (b) to cease business, in whole or in part, with or through American Express.
2. Until July 2, 1999, from using any confidential information belonging to American Express in connection with any business in competition with American Express.
This Court hereby preliminarily enjoins the defendant Michael J. Riccio as follows:
3. With respect to any persons or entities whom Riccio served while representing American Express and for whom he is not the financial advisor or registered representative as a representative of any broker-dealer other than American Express (“Non-Clients”), Riccio is preliminarily enjoined:
a. until December 11, 1998, from directly or indirectly offering for sale, selling, or seeking an appli *249 cation for any Products (defined as certificates, stock, other securities or investments, lending products, life insurance and annuity policies and contracts, and other insurance products) or Services (defined as financial planning, advisory, securities brokerage, tax, or other financial services);
b. until August 11, 1999, from soliciting any Non-Clients (a) to do financial services business with, or to become clients of, him or any broker-dealer with which he is associated, or (b) to cease business, in whole or in part, with or through American Express.
4. Until August 11, 1999, from using any confidential information belonging to American Express in connection with any business in competition with American Express.
This Court hereby preliminarily enjoins all defendants as follows:
5. Walker and Healey, until July 2, 1999, and Riccio, until August 11, 1999, are directed (a) to maintain a log of the name, date, and mode (e.g., telephone, mail, etc.) of the initial inquiry to any defendant of every Non-Client who inquires about financial products and/or services, except if the Non-Client is the spouse, parent, or child of any of the defendants, and (b) to segregate and maintain separate accounts and records of all services and products sold or provided after July 2, 1998 (for Walker and Healey) and after August 11, 1998 (for Riccio) to any persons or entities whom they served while representing American Express.
6. Defendants shall, within ten days of this Order, return to counsel for American Express any and all materials, including client lists and records, in their possession, custody, or control that belong to American Express, except materials concerning the accounts of their current clients.
Nothing in this Order shall affect the defendants’ business and financial dealings with their spouse, children, and parents.
Dated: October 28, 1998

A11 of the agreements signed by the defendants early in their affiliation with American Express were with IDS; the name change to American Express came later. For the sake of simplicity, I will refer to the plaintiff as American Express even when discussing events that occurred when it was known as IDS.

A defendant’s status as an independent contractor rather than an employee, in some contexts, may have consequence in deciding whether to enforce a restrictive covenant, but it does not have consequence in this decision.

A “Client” under the Agreement was defined as “a person or entity who (1) purchases or holds a Product or Service acquired from or through IDS or an Affiliate or one of their Planners with the consent of IDS or the Affiliate; or (2) authorized IDS, an Affiliate or one of their Planners to make personal financial planning presentations to it or its employees or members; or (3) is a member of a Client’s household.” (Section I(l)(p).)

The only evidence of client “tampering” that American Express has mustered is that many of defendant Riccio’s former clients at American Express have submitted form letters to American Express asking that their accounts be reassigned to John Gunning, an American Express financial advisor who was in Riccio’s training class. From these letters and Riccio’s telephone calls to American Express on behalf of these former clients, it is plain that Riccio is communicating with these former clients and advising them regarding the reassignment. Yet, it does not appear that Riccio is seeking to solicit these clients to leave American Express and join him. Indeed, he simply appears to be helping them find an American Express financial advisor who will provide them with better advice and service. While American Express complains about this conduct, it has pointed to no provision of the Planner’s Agreement that it violates. No similar allegation has been made regarding the defendants Walker and Healey.

The parties all agree that there are no substantive differences between Minnesota and Massachusetts law with respect to non-compete and confidentiality covenants. Therefore, decisions from both jurisdictions are cited in this decision.

Factors that Massachusetts courts consider to determine whether a covenant is sufficiently reasonable to enforce include the legitimate business interests of the employer, the duration and geographic scope of the restriction, and the impact of enforcement on the public. See Woolley’s Laundry v. Silva, 304 Mass. 383, 387 (1939); All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974). See also Restatement (Second) of Contracts, §188(1) (1979) (“A promise to refrain from competition ... is unreasonably in restraint of trade if (a) the restraint is greater than is needed to protect the promisee’s legitimate interest, or (b) the promisee’s need is outweighed by the hardship to the promisor and the likely injury to the public”).

This Court expressly does not decide whether the failure to disclose this information to clients constituted a breach of American Express’s or the defendants’ fiduciary duty to their clients.

 I note that a four month prohibition is consistent with the amount of time American Express deems sufficient for a successor financial advisor to establish herself to a client as a worthy replacement to the departed advisor. In a sample form letter routinely sent to clients upon the termination of a financial planning relationship, American Express estimates that a new advisor-client relationship can be satisfactorily established within a few months:
We realize that this change may be an inconvenience and we want to assure you that we will strive to make the transition a smooth one. For most clients, this process is completed within 30 days. A few months after your transition to a new advisor, we will follow up to ensure that your expectations have been met.

While even subtle hints could be eliminated by barring financial advisors from giving any notice to clients of their departure from American Express and prohibiting all contact with them following their departure, it would be fundamentally unfair to clients to require their financial advisor to disappear from their lives without notice. In short, the law should not bar all communication with clients regarding their financial advisors’ resignation from American Express but, if such communications are allowed, there is likely to be some degree of solicitation implicit in the communication, no matter how veiled. A four month period in which the financial advisor is barred from accepting the former client’s business at least means that, if a client chooses to stay with the financial advisor, he will do so only after four months have passed from the communication informing him of his advisor’s departure from American Express. By then, not only will American Express have had the opportunity to establish a relationship between the client and a new financial advisor but any subtle solicitation done at the time of departure will *250 be four months old and likely forgotten. I note that any form letters sent by financial advisors to their clients must comply with NASD rules, one of which requires approval prior to distribution by a registered principal of the member.

The four month bar would have a negligible impact on Walker and Healey, since it would expire within days of the issuance of any injunction. It would have a greater impact on Riccio, who left American Express after the other two defendants.

The Planner’s Agreement prohibits the defendants from ever using confidential information “in a manner adverse to” American Express, but it limits to one year the prohibition on using any confidential client information with any business in competition with American Express. American Express here seeks only a one year injunction on the use of confidential information.

As used in this Order, soliciting means taking any action, directly or indirectly, to attract, including without limitation requesting, encouraging, inducing and/or persuading. Except as provided in 1(a) and 3(a), the defendants are not prohibited from accepting business from American Express clients who independently seek their services in the absence of any direct or indirect soliciting activity on any defendant’s part.