ARTHUR M. WELLS vs. RUTH A. WELLS
(and a companion case[1]).

Worcester. January 16, 1980. — March 3, 1980.

Present: ARMSTRONG, ROSE, & KASS, JJ.

*Contract*, Covenant against competition.

In an action on an agreement incorporated in a divorce decree, by which
the wife agreed to purchase the husband's interest in a corporation
providing homemaker services and the husband agreed not to compete
with the corporation in certain areas, including the "greater New Bed-
ford, Plymouth and Fall River areas," findings were warranted that
enforcement of the agreement in those areas would not result in a
monopoly of the homemaker services market in them, that the cor-
poration had a legitimate business interest in those areas even though it
had no offices or customers in them at the time the agreement was
signed, but that a restraint unlimited in time was unreasonable; hence,
the judge properly concluded that the agreement was enforceable for a
period of fifty-two months. [323-327]

CIVIL ACTION for modification of a judgment of divorce,
commenced in the Probate Court for the county of Worces-
ter on June 15, 1978.

CIVIL ACTION commenced in the Superior Court on June
30, 1978.

On transfer of the second action to the Probate Court for
the county of Worcester, the cases were heard together by
*Conlin, J.*

[1] Ruth A. Wells and Ramson, Inc. vs. Arthur M. Wells and Care-At-
Home Nursing Services, Inc. Arthur Wells initiated the proceedings in
the Probate Court on June 15, 1978, with a complaint for modification of
a divorce decree. Ruth Wells and Ramson, Inc., countered on June 30,
1978, with a complaint in Superior Court to enforce the agreement dis-
puted in both actions. The second action was transferred to the Probate
Court, where the cases were heard together.

*David A. Talman* for Arthur M. Wells & another.
*Michael P. Angelini* for Ruth A. Wells & another.

KASS, J. When Ruth A. Wells (Ruth) and Arthur M. Wells (Arthur) ended their marriage in divorce, they also put asunder their interest in a corporation, Ramson, Inc., in which each owned half the capital stock. Under the agreement (entitled "STIPULATION") which became incorporated in the divorce decree, Arthur agreed with Ruth to sell his stock in Ramson, Inc., to it for $52,500, of which $2,500 was to be paid "forthwith," the balance in monthly payments of $1,000, with no interest. Arthur agreed not to compete with Ramson, Inc., within Worcester County, Barnstable County and the "greater New Bedford, Plymouth and Fall River areas."[2] It is the enforceability of the agreement not to compete in Fall River and New Bedford which is the subject of controversy.

After the divorce, Arthur organized a corporation, Care-at-Home Nursing Services, Inc., which provides the same sort of homemaker services as Ramson, Inc., does. Its areas of operation were Springfield, Newton, Salem and Lawrence and the environs of those cities. Both corporations do business principally by contracting with regional nonprofit corporations organized under the sponsorship of the Commonwealth's Department of Elder Affairs to provide social services to eligible individuals within the "service area." At the time of the Wells divorce no quasi-public corporation of this sort had been organized in the Fall River or New Bedford service areas. Corporations were organized in those areas in 1977. Arthur notified Ruth in February, 1978, that he proposed to do business in the Fall River and New Bedford service areas since she had not as yet done so. In March, 1978, Ramson signed a contract for homemaker

---

[2] We have drawn these facts and others recited later in this opinion from findings of fact made by the trial judge, whose findings stand unless clearly erroneous, Mass.R.Dom.Rel.P. 52(a) (1975), which in this regard is the same as Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974), or unless the findings or conclusions are tainted by an error of law. *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 674 (1977).

services with the newly established New Bedford service area corporation. On May 30, 1978, Arthur's corporation advertised in the Fall River Herald News for a director of a New Bedford branch office. The complaints initiating these law suits were soon in the mail.

Following entry of judgments, which gave effect to the non-competition agreements, the parties filed cross-appeals: Arthur and Care-At-Home Nursing Services, Inc., claiming in substance that the restrictive covenant is not enforceable in Fall River and New Bedford at all; Ruth and Ramson, Inc., claiming the restrictive covenant should be enforced without time limit.

Were the contested noncompetition agreement between an employer and an employee, the restrictive clause would not be enforceable because at the time of its execution Ramson, Inc., did no business in New Bedford and Fall River. Its business, which involved providing homemaker services for elderly persons, was then active in Worcester and Hyannis, and Ramson had neither offices nor telephone listings in New Bedford or Fall River. Out of concern for an individual's ability to earn a living and to protect against monopoly, employee covenants not to compete are enforceable only to the extent they are necessary to protect the legitimate interests of the employer. *Richmond Bros.* v. *Westinghouse Bdcst. Co.*, 357 Mass. 106, 111 (1970). *All Stainless, Inc.* v. *Colby*, 364 Mass. 773, 778 (1974). *Marine Contractors Co.* v. *Hurley*, 365 Mass. 280, 287 (1974). *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 673-674 (1977). *National Hearing Aid Centers, Inc.* v. *Avers*, 2 Mass. App. Ct. 285, 288-291 (1974). Restatement of Contracts § 515 (1932).[3] The interests which an employer may protect are trade secrets, confidential data, and good will, *New England Canteen Serv., Inc.* v. *Ashley, supra* at 674, and where, as in the instant case, trade secrets and confidential

---

[3] The rich decisional and textual literature on the subject of employer-employee noncompetition clauses is reviewed in detail in the *All Stainless*, *Marine Contractors* and *National Hearing Aid Center* opinions.

data are not in issue, if the geographical scope of the agreement has exceeded the territory in which the employer did business, the non-competition clause has been held to be unenforceable. *All Stainless Inc.* v. *Colby,* 364 Mass. at 780, and cases cited. Underlying this limitation is the idea that where there has been no business, there cannot have been much good will.

Concern about the restricted individual and the probability of unequal bargaining power between an employer and an employee recedes when the restriction arises in the context of the sale of a business or, as in the case at bar, the sale of an interest in a business. *Whitinsville Plaza, Inc.* v. *Kotseas,* 378 Mass. 85, 102 (1979). *Alston Studios, Inc.* v. *Lloyd V. Gress & Associates,* 492 F.2d 279, 284 (4th Cir. 1974). "[C]ourts properly should, and do, look more critically to the circumstances of the origin of postemployment restraints than to the circumstances of other classes of restraints." Blake, Employee Agreements not to Compete, 73 Harv. L. Rev. 625, 647 (1960). See also Levin, Non-Competition Covenants in New England: Part II, 40 B.U.L. Rev. 210, 213 (1960). "No identical test of reasonableness applies to bargains for the transfer of land or goods or of a business, on the one hand, and to bargains for employment on the other. The elements that must be considered in order to determine reasonableness differ in the two cases." Restatement of Contracts § 515, Comment b (1932). Compare 14 Williston, Contracts § 1643 (3d ed. 1972).

Among the considerations which favor more liberal enforcement of buyer-seller covenants are: that a seller of a business interest may not derogate from the value of the business as sold by competing with it, *Old Corner Book Store* v. *Upham,* 194 Mass. 101, 105 (1907); *Marshall Engine Co.* v. *New Marshall Engine Co.,* 203 Mass. 410, 424 (1909), aff'd, 223 U.S. 473 (1912); *Tobin* v. *Cody,* 343 Mass. 716, 722 (1962); that the buyer is entitled to the full value of the "benefit and advantages" of his purchase, *Auslyn, Inc.* v. *Rousseau,* 321 Mass. 735, 736 (1947); and that the parties entered into the agreement with the assist-

ance of counsel and without compulsion (an element frequently not present in the employer-employee context), *Loranger Constr. Co. v. C. Franklin Corp.*, 355 Mass. 727, 729-730 (1969). See also *United Shoe Mach. Co. v. Kimball*, 193 Mass. 351, 359 (1907); *United Tool & Indus. Supply Co. v. Torrisi*, 356 Mass. 103, 107 (1969), the latter suggesting greater weight will be given to express restrictions than implicit ones. Thus, in the buyer-seller context restrictions "are not rendered unenforceable merely because they protect an interest we might not recognize in any employment setting. Unreasonableness in time, space, or product line, or obstruction of the public interest, are the principal bars to enforcement." *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 102-103 (1979).

We proceed to analyze the agreement before us in terms of these criteria. Arthur argues that enforcement of the agreement is against the public interest because it will reduce competition among suppliers of services for which the Commonwealth and the Federal government are indirectly customers.[4] There are, however, five additional providers of homemaker services in the Fall River and New Bedford service areas (the judge's findings say "approximately six" inclusive of Ramson), so that it cannot be said that competition was reduced in any significant fashion. Barring Arthur from these areas does not result in monopoly of the homemaker services market in them.

The criterion of product line plays no role in this case.

The reasonableness of the space carved out by the restrictive agreement is the issue about which contention swirls. Certainly the designation of the "greater New Bedford, Plymouth and Fall River areas" as the forbidden territories in the Wellses' agreement was neither so broad nor so sweeping as to render it unenforceable. See *All Stainless, Inc. v. Colby*, 364 Mass. at 779-780; *Middlesex Neurological Associ-*

---

[4] The government nexus exists by reason of the Commonwealth's sponsorship and supervision and the Federal government's funding of the regional nonprofit corporations with which Ruth's and Arthur's corporations typically contract.

*ates* v. *Cohen,* 3 Mass. App. Ct. 126, 130 (1975). Compare
*Marine Contractors Co.* v. *Hurley,* 365 Mass. at 289.
Demonstrably Arthur and his corporation are able to do
business in Massachusetts, because they do so in the western
and northern sectors. Arthur urges, however, that the re-
strictive covenant is unenforceable because in 1975, when
the agreement was signed, Ruth and Ramson had no custo-
mers or offices in Fall River and New Bedford, hence no
good will in those service areas. Lacking good will in that
territory, the argument continues, relying heavily on *New
England Canteen Serv., Inc.* v. *Ashley,* 372 Mass. at 675-
676, Ruth and Ramson had no interest to protect other than
relief from competition and, therefore, the contract is not to
be enforced. Here the distinction between buyer-seller and
employer-employee restrictive contracts becomes determin-
ative: it expands the reasonable interest which a buyer may
protect. The distinction, although recently restated in
*Whitinsville,* has long been recognized. *Sherman* v. *Pfef-
ferkorn,* 241 Mass. 468, 474-475 (1922). In exchange for
$52,500, Ruth and Ramson could reasonably expect to plan
for a southeasterly expansion of their business to a territory
geographically between the areas of existing business activi-
ty, Hyannis and Worcester. Obviously Ruth had those spe-
cific locations in mind when she made her agreement with
Arthur. Ruth and Ramson's business interest in the restric-
tion could, for example, include freedom from intervention
by a person formerly associated with Ramson who bore the
same surname as the principal of Ramson. Reasonable
business interest in the buyer-seller setting amounts to a
reading of good will more expansive than customer contacts
extant at the time of agreement. *United Shoe Mach. Co.* v.
*Kimball,* 193 Mass. at 357. *Marshall Engine Co.* v. *New
Marshall Engine Co.,* 203 Mass. at 422-423. Contrast 6A
Corbin, Contracts § 1387 (1962). *Marshall Engine* con-
trasted the broader scope of the business there considered
with the hypothetical sale of the good will of a small grocery
store in the south end of Boston. In the small store model
the seller "without doubt might set up a small grocery store

in the north end of the same city. Customers of small grocery stores are those living in the immediate neighborhood, and a similar store in another locality would not affect the rights acquired by the purchaser of the good will in the first store." 203 Mass. at 422. Here the area in which Ramson, Inc., and Ruth had achieved reputation might well have extended beyond the area of previous customer contact, and the buyer of Arthur's stock could so define the area of legitimate business interest for which the buyer proposed to pay $52,500.[5] If it was possible to observe in 1898 in *Anchor Elec. Co.* v. *Hawkes,* 171 Mass. 101, 105-106 (1898), that modern communication had expanded an earlier more parochial view of the area of legitimate business interest, this is certainly true in the era of far more rapid travel and transmission of information in which we now live. It was in this sense of legitimate business interest, or expanded good will, that the judge below correctly concluded that Ruth "has a sufficient [good will] interest" in the restricted area.

As to the fourth and final test of the restriction, reasonableness of time, we agree with the judge's inferential conclusion that a restraint unlimited in time was unreasonable, and we accept his finding that fifty-two months is a reasonable time, a period he apparently chose because it was roughly equivalent to the period for the completion of payment by Ramson of the price for Arthur's stock. See *Catania* v. *Hallisey,* 352 Mass. 327, 331 (1967). The judge's finding that no harm to the business of Ruth and Ramson had been proved which would flow from Arthur's operating in Fall River and New Bedford in the future supports a decision that a restriction unlimited in time would not be reasonable.

By order of a single justice of this court, the judgments entered in the Probate Court enjoining Arthur and his corporation, Care-At-Home Nursing Services, Inc., "from en-

---

[5] The judge's findings expressly do not attempt to determine how much of the aggregate purchase price was allocable to the agreement not to compete.

gaging in the business of home health care services within the New Bedford and Fall River" areas for fifty-two months beginning December 30, 1975, was stayed pending appeal. The order for the stay was entered March 5, 1979. Between entry of the order and the issuance of a rescript in this case approximately one year will have elapsed. Had the injunction stayed in force it would have expired, by the terms of the judgment, on April 30, 1980. So as to give Ruth and Ramson the benefit of its original terms, the judgments are to be modified so as to enjoin the defendants from engaging in the business of home health care services within the New Bedford and Fall River geographical areas until April 30, 1981. We understand that, pending appeal, Ramson has suspended its monthly payments on account of the purchase price paid for Arthur's stock. No argument has been made that damages should, or practically could, be assessed for whatever violations of the agreement may have occurred. Our order for modification of the judgments assumes the orderly resumption of those payments. As thus modified, the judgments are affirmed.

*So ordered.*