van Gestel, Allan, J.
This matter comes before the Court on an application of the plaintiff, Jeffrey M. Kauzens (“Kauzens”), seeking preliminary injunctive relief against the defendant, Diamond Diagnostics, Inc. (“Diamond”). The complaint is a pre-emptive strike by Kauzens. It is Diamond which has threatened to enforce a Non-Competition, Non-Solicitation, and Non-Disclosure Agreement (the “Agreement”) against Kauzens, its former employee.

BACKGROUND

Diamond is in the business of refurbishing and repairing used clinical laboratory and medical instruments for resale in the domestic and international marketplace. It is based in Holliston, Massachusetts. Diamond’s Internet website describes itself as having been “established in 1996, to offer small to mid-sized laboratories a truly reliable and cost effective alternative to new instrumentation offered by the Original Equipment Manufacturer (OEM).”
Diamond has developed a network of contacts who give it advance notice of used instrumentation as that piece of equipment comes off-line from hospitals and laboratories worldwide. Diamond then purchases these machines and ships them to its facility in Hollistion where its employees “literally transform the used equipment into like-new condition so that it can be used productively in medical applications around the world.” The refurbished equipment is then resold to others — not returned to the place from whence it was acquired.
Kauzens was hired by Diamond in January of 1999. When hired, Kauzens, age twenty-three, had no formal training in engineering, his most recent work experience was in insulation and gutter installation, and he had only a high school diploma. Obviously, however, Kauzens had some natural talent because he quickly learned to be an effective refurbisher and repairer of Diamond’s acquired used equipment.
Kauzens’ initial position at Diamond was clearly at entry level even for a high school graduate. His annual starting salary was $23,000. Diamond’s January 19, 1999 offering letter advised that Diamond “also [has] a confidentiality agreement which is required prior to [his] start of employment.” The employment began on January 25, 1999, and at that time Kauzens was presented with, and signed, the Non-Competition, Non-Solicitation, and Non-Disclosure Agreement that is now in issue.
As a result of Kauzens’ good work, Kauzens, when he left Diamond was earning at a rate of $47,300 per year. However, by the summer of 2004, Kauzens was not totally happy with the work atmosphere at Diamond and began to look elsewhere for work. He was an employee at will.
In late March of 2005, Kauzens applied for a job at a company called Beckman Coulter, Inc., which, although based elsewhere, had a local facility in Wake-field, Massachusetts. The starting salary for Kauzens at Beckman Coulter was to be $46,000. He was to begin work there on May 9, 2005.
Beckman Coulter, although perhaps doing some refurbishing or repairing of clinical laboratory and medical instruments, is principally an OEM manufacturer of its own clinical laboratory and medical instruments.
Kauzens, in an affidavit supporting his motion, states that in his employment at Beckman Coulter he “will not be working on refurbished equipment, [he] will only be working on newly manufactured equipment.” Further, Kauzens avers that his “prospective position at Beckman Coulter has nothing to do with the sales or marketing for refurbished equipment.”
While at Diamond, Kauzens did not have any contact with that company’s customers for refurbished equipment.
Kauzens gave notice of his termination to Diamond on April 21, 2005. He left permanently on April 22, 2005, after completing a project he was working on.
*402 Shortly after Kauzens left Diamond, Diamond contacted both Kauzens and Beckman Coulter threatening enforcement of the Agreement. This, apparently, has caused Beckman Coulter to hold off on hiring Kauzens, thus leading to this suit.
Although Diamond is not an OEM manufacturer like Beckman Coulter, it claims that the two companies compete.
The key non-competition provision of Diamond’s Agreement with Kauzens, modified for clarity, reads as follows:
During the (period . . . ending three years after Kauzens ceases to be employed], [Kauzens] will not, anywhere in the [world in which the business, operations, and assets of Diamond is being conducted], directly or indirectly, in one or a series of transactions, own, mange, operate, control, invest or acquire an interest in, or otherwise engage or participate in, whether as a proprietor, partner, stockholder, lender, director, officer, employee, salesman, agent, advisor, consultant, independent contractor joint venturer, investor, lessor, or in any other capacity, any business which competes, directly or indirectly, with [Diamond] . . . Kauzens, although challenging the entire Agreement, advised the Court that he will comply fully with the non-disclosure and non-solicitation portions thereof. Consequently, this memorandum will focus solely on the non-competition aspects of the covenant.

DISCUSSION

In order to prevail on his request for preliminary injunctive relief, Kauzens bears the burden of showing his likelihood of success on the merits; that he will suffer irreparable harm if the injunctive relief sought is not granted; and that his harm, without the injunction, outweighs any harm to Diamond, from its being enjoined. GTE Products Corp. v. Stewart, 414 Mass. 721, 722-23 (1993); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). Before assaying these issues, it is appropriate to canvass the relevant elements of the Massachusetts law dealing with the enforcement of non-competition agreements.
The legal history of these kinds of covenants dates back at least to Lord Macnaughten, in England in the late 19th century. In Nordenfeldt v. Maxim Nordenfelt Guns & Ammunition Co., [1894] A.C. 535 at 565, he reminded his readers that enforcement of these kinds of covenants is an exception to the general rule when he said:
The public have an interest in every person’s carrying on his trade freely: so has the individual. All interference with individual liberty of action in trading, and all restraints of trade themselves, if there is nothing more, are contrary to public policy, and therefore void. That is the general rule. But there are exceptions: restraints of trade and interference with individual liberty of action may be justified by the special circumstances of a particular case. It is a sufficient justification, and indeed it is the only justification, if the restriction is reasonable — reasonable, that is, in reference to the interest of the parties concerned and reasonable in reference to the interest of the public, so framed and so guarded as to afford adequate protection to the party in whose favour it is imposed, while at the same time it is in no way injurious to the public. That, I think, is the fair result of all of the authorities.
Massachusetts adopted Lord Macnaughten’s statement at least as early as 1922. See Sherman v. Pfefferkorn, 241 Mass. 468, 474 (1922).
Most recently the law has been recited as follows:
A covenant not to compete is enforceable only if it is necessaiy to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest. See Marine Contrs. Co., v. Hurley, 365 Mass. 280, 287-88 (1974); All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974). Covenants not to compete are valid if they are reasonable in light of the facts in each case. See Marine Contrs. Co. v. Hurley, supra, at 287; Saltman v. Smith, 313 Mass. 135, 145 (1943). Historically, covenants not to compete typically have arisen in either the employment context or in the context of the sale of a business. See, e.g., Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85 (1979) (sale of business); Marine Contrs. Co. v. Hurley, supra (employment); All Stainless, Inc. v. Colby, supra, (employment); Alexander & Alexander, Inc. v. Dan-ahy, 21 Mass.App.Ct. 488 (1986) (sale of business). In the context of the sale of a business, courts look “less critically” at a covenant not to compete because they do not implicate an individual’s right to employment to the same degree as in the employment context. See Alexander & Alexander, Inc. v. Danahy, at 498, citing Whitinsville Plaza, Inc. v. Kotseas, supra at 102-03, and Wells v. Wells, 9 Mass.App.Ct. 321, 323-25 (1980). Moreover, in the context of the sale of a business, courts are less concerned with unequal bargaining power between the parties. Wells v. Wells, supra at 324. Rather, courts consider whether “the parties entered into the agreement with the assistance of counsel and without compulsion (an element frequently not present in the employer-employee context.)” Wells v. Wells, supra at 324-25, and cases cited . . .
Boulanger v. Dunkin’ Donuts Incorporated, 442 Mass. 635, 639-40 (2004).
Legitimate business interests include protection of trade secrets, confidential information, and good will. Marine Contrs. Co. v. Hurley, supra at 287. A covenant not to compete designed to protect a party from ordinary competition does not protect a legitimate business interest.

Id.

*403 As observed above, the posture of this case is unusual in that what is really sought is an injunction against Diamond, the former employer, enforcing its non-competition agreement with Kauzens, the former employee. Both at oral argument, and in their supporting memoranda and affidavits, however, the parties advocated as if this was a proceeding in which Diamond was suing Kauzens for relief under the Agreement. The law is the same either way, but the burden of convincing the Court is shifted.
The Court begins with issues relating to the likelihood of success of Kauzens being able to defeat Diamond’s enforcement of the Agreement. This turns on the degree to which Beckman Coulter competes with Diamond, and the degree to which Kauzens, in any event, will be involved in any way in that competition.
Diamond and Beckman Coulter are not shown, in any way, to compete in the OEM business relating to the manufacture and sale of clinical laboratoiy and medical instruments in the domestic and international marketplace. Quite simply, Diamond, as it says in its website, is not in the OEM end of the business. Instead, Diamond buys used equipment, fixes it up— indeed, sometimes adds things that makes it different and, presumably, better — and then sells the refurbished product to others.
The extent and nature of Beckman Coulter’s efforts in buying used equipment, refurbishing it and selling it to others was in no way made clear to the Court by either Kauzens or Diamond. What was clear, however, is that Kauzens, if engaged by Beckman Coulter will not be employed to refurbish used equipment — like he did for Diamond — but rather will be servicing Beck-man Coulter’s newly manufactured equipment in the hands of its customers. This is not competition with Diamond.
Further, if Kauzens does become employed by Beck-man Coulter to do the kind of work that was described to this Court he will not, to use the words of the Agreement, “in one or a series of transactions, own, mange, operate, control, invest or acquire an interest in, or otherwise engage or participate in, whether as a proprietor, partner, stockholder, lender, director, officer, employee, salesman, agent, advisor, consultant, independent contractor joint venturer, investor, lessor, or in any other capacity, any business which competes, directly or indirectly, with” Diamond.
It also appears, at least on the record before the Court, that there is no showing of any sufficient irreparable harm to Diamond if Kauzens is employed by Beckman Coulter in the manner described. “Economic harm alone . . . will not suffice as irreparable harm unless ‘the loss threatens the veiy existence of [Diamond’s] business.’ ” Tri-Nel Management, Inc. v. Board of Health of Barnstable, 433 Mass. 217, 227-28 (2001). Indeed, here no kind of economic harm to Diamond was suggested if Kauzens is employed as he indicates.
Lastly, on the present record, the balance of harms as between Kauzens being unemployed in a kind of work he understands and Diamond being hurt if Kauzens works for Beckman Coulter in the manner described falls considerably in favor of Kauzens.
The real concerns of Diamond seem not so much with Kauzens working for Beckman Coulter than with his leaving Diamond. Diamond speaks glowingly of Kauzens’ skills and of his importance to Diamond’s refurbishing work. But, despite this concern, Kauzens was left as an employee at will, with no job security whatsoever, and was far from being compensated at executive or senior technical employee level wages.[1]
Diamond speaks of its concern about trade secrets — apparently in means and methods for upgrading and refurbishing equipment — and confidential information as to sources of repair parts. As to this, Kauzens has agreed to comply with the non-disclosure and non-solicitation aspects of the Agreement. It seems hard to see that his work for Beckman Coulter— repairing new Beckman Coulter equipment — touches in any way on Diamond’s secrets or confidential information regarding the repair of other companies’ used equipment, or the sources for materials to make those repairs.
Diamond posits the following in its opposition:
Beckman Coulter’s sales of new diagnostic equipment are undeniably impacted by Diamond’s ability to refurbish and sell used Beckman Coulter equipment. Why would a medical professional buy a new piece of equipment from Beckman Coulter when it can get a similar piece of equipment from Diamond at half the price?
This comment is revealing for two reasons. First it reflects that it is competition between new Beckman Coulter equipment and Diamond-refurbished Beck-man Coulter equipment that is of concern. Second, of course, Kauzens is not going to be refurbishing used Beckman Coulter equipment in his employment with that company. Thus, if Kauzens is not working on refurbishing used Beckman Coulter equipment, and is not revealing confidential information about Diamond’s methods, how is Diamond irreparably hurt?
Diamond has not brought any action to enforce its Agreement with Kauzens. It has merely, but apparently with some adverse effect on Kauzens’ employment with Beckman Coulter, threatened to do so. On the present record, this Court would be disinclined to enforce the non-competition aspect of the Agreement if Kauzens’ employment by Beckman Coulter is limited in the way that Kauzens has described it — at least for the next three years. On the other hand, given Kauzens’ concessions, this Court would be inclined to impose limitations on Kauzens of a nature consistent *404 with the non-disclosure and non-solicitation aspects of his Agreement with Diamond.
Under the present situation, with Diamond only threatening, and with Kauzens agreeing to non-disclosure and non-solicitation, this Court sees no need to enjoin Diamond from seeking any injunctive relief. Obviously, if this case proceeds to discovery, or other evidence is presented, and that discovery or evidence demonstrates a factual situation different from that suggested above, this Court would reconsider its position.

ORDER

For the foregoing reasons, this Court, at this time, takes no action on the Plaintiff Jeffrey M. Kauzens’ Motion for Emergency Preliminary Injunction, Paper #6.

The seven-year climb from $23,000 per year to $47,300 per year rather clearly reflects that Kauzens, although having demonstrated potential and a strong work ethic, was hardly being treated as being in a capacity that needed to be preserved for the best interest of the company.