Hinkle, Margaret R., J.
In this one-count action for breach of contract, BNY Mellon, N.A., (“BNY Mellon”) alleges that former employee Coiy Schauer violated restrictive covenants set forth in a nonsolicitation and confidentiality agreement. After a hearing on April 14, 2010, the Court granted BNY Mellon’s Renewed Mo *330 tion for Temporary Restraining Order to enforce those covenants. Currently before the Court is BNY Mellons’ motion for a preliminary injunction.
Upon consideration of the motion papers, supporting materials and oral argument, the Court allows in part and denies in part BNY Mellon’s motion and hereby dissolves the April 14 Order.
BACKGROUND
“By definition, a preliminary injunction must be granted or denied after an abbreviated presentation of the facts,” Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616 (1980), which here includes the Verified Complaint with attachments,[1] affidavits and declarations from both parties and deposition testimony and documents produced through the limited discovery conducted thus far. The material facts in the record are as follows.
In 2005, Mellon Financial Corporation (“Mellon Financial”), a predecessor of BNY Mellon, hired Schauer for its Wealth Management Group.[2] (Verified Compl. at 2, par. 2; see Schauer Decl. at par. 5.) At the time, Schauer was a partner at the law firm of Donovan Hatem LLP (“Donovan Hatem”), specializing in tax, trusts and estates. (Schauer Decl. at par. 4; see Verified Compl. at par. I.)[3] He was hired as a Portfolio Manager to provide clients with investment services, including advice how to invest assets to achieve financial and estate planning goals. (Verified Compl. at 2, par. 2; see Schauer Decl. at par. 11.)
According to Schauer, the “vast majority” of clients to whom he provided financial services as a Portfolio Manager were brought from Donovan Hatem or developed over the years through referrals from attorneys, accountants and insurance professionals whom he knew from his law practice or from personal networking. (Schauer Decl. at pars. 9-10 & 23; see also Schaeur Suppl. Decl. at par. 2.)[4] Schauer’s clients, “dozens” of whom had “substantial” assets under management, generated annual revenue over $2.3 million for the firm. (See Schauer Decl. at pars. 13 & 24.)
As a condition of employment at Mellon Financial, Schauer signed a nonsolicitation agreement. (Verified Compl. at 3, par. 4.) However, in late 2007, during a review of employee personnel records following Mellon Financial’s merger with Bank of New York, a copy of that agreement could not be located. (Dicker Aff. at par. 6.) Schauer was then presented with a second Nonsolicitation and Confidentiality Agreement (“Agreement”). (Verified Compl. at 3, par. 5; See Dicker Aff. at par. 7; Schauer Decl. at par. 7.) In relevant part, the Agreement stated:
In consideration of and as a condition precedent to the following additional compensation (the adequacy, sufficiency and receipt of which are hereby acknowledged) and providing I execute this Non-solicitation and Confidentiality Agreement (“Agreement”) within fifteen (15) days of its receipt, I will be awarded a one-time restricted stock award of 661 shares on February 21, 2008 in accordance with all of the applicable terms and conditions of the Mellon Financial Corporation Long-Term Profit Incentive Plan (2004) and the Restricted Stock Agreement. I hereby enter into this Agreement, and represent, warrant, covenant and agree as follows:
2. (a) I acknowledge that, by reason of my duties, I will be given or may have access to and become informed of information which BNY Mellon possesses or to which BNY Mellon had access, and which relates to BNY Mellon, is not generally known to the public or in the trade or is a competitive assets and/or otherwise constitutes a “trade secret,” as that term is defined by applicable law, of BNY Mellon (collectively, “Confidential Information”), including without limitation, non-public: (i) planning data and marketing strategies; (ii) terms of any new products and investment strategies; (iii) information relating to other officers and employees of BNY Mellon; (iv) financial results and information about the business condition for BNY Mellon; (v) terms of any investment, management or advisory agreement or other material contract; (vi) proprietary software and related documents; (vii) customer and potential customer prospecting lists and contact persons at such customers and customer prospects; (viii) names and other information regarding any BNY Mellon Paid Channel (as hereinafter defined) and contact persons at any such BNY Mellon Paid Channel; and (viii) [sic] material information concerning customers of BNY Mellon or their operations, condition (financial and otherwise) or plans.
(b) I acknowledge that my employment by BNY Mellon creates a relationship of confidence and trust between me and BNY Mellon with respect to Confidential Information and that Confidential Information, regardless of its form or format and whether compiled or created by me or BNY Mellon, will remain the sole property of BNY Mellon and that I shall not, either directly or indirectly, at any time, while an employee of BNY Mellon or thereafter, make known, divulge, reveal, furnish, make available, or use (except for use in the regular course of my duties for BNY Mellon) any Confidential Information without the written consent of BNY Mellon.
I also agree that this obligation is in addition to, and not in limitation or preemption of, all other obligations or confidentiality that I may have to BNY Mellon under its Code of Conduct or Securities Trading policy or other policies or general or specific legal or equitable principles. I expressly agree that upon termination of my employment, regardless of reason, I will immediately return to BNY Mellon all of BNY Mellon’s property, including without limitation any property from which any Confidential In *331 formation may be discerned in any manner. I expressly acknowledge that in order to solicit a customer or employee as defined in Section 3 I would be using information considered by BNY Mellon to be confidential. I understand and acknowledge that my obligations under this Section 2 survive termination of my employment, regardless of reason, and will continue indefinitely unless and until any such Confidential Information has become, through no fault of mine, generally known to the public or I am required by law (after providing BNY Mellon as applicable with notice and an opportunity to contest such requirement) to make disclosure . . .
3. During my employment and for twelve (12) months thereafter, regardless of the reason for termination, I shall not, in any capacity, directly or indirectly:
(a) (i) solicit the business or patronage of any Customer or BNY Mellon Paid Channel for myself or on behalf of any person or entity other than BNY Mellon for the purpose of providing Relevant Wealth Management Services, (ii) divert, entice or otherwise take away from BNY Mellon the business or patronage of any Customer, or BNY Mellon Paid Channel or attempt to do so, (iii) provide for myself or on behalf of any person other than BNY Mellon any Relevant Wealth Management Services to any Customer or any customer of BNY Mellon Paid Channel or(iv) solicit or induce any Customer or BNY Mellon Paid Channel to terminate or reduce its relationship with BNY Mellon; . . .
For purposes of this Agreement, “Customer” shall mean any person or entity which whom I may have contact in my capacity as an employee of a BNY Mellon entity and who (a) is receiving Wealth Management Services from Wealth Management or a BNY Mellon entity (in the latter case though only to the extent that the BNY Mellon Entity is providing asset management services to the affiliate through an advisor/sub-advisor arrangement or a dual officer arrangement) on the date of termination of my employment with BNY Mellon, (b) received such services for compensation at any time during the twelve (12) months period immediately preceding the date of termination of my employment with BNY Mellon, or (c) was solicited, directly or indirectly, in whole or in part, by me on behalf of Wealth Management to obtain Wealth Management Services within twelve (12) months preceding termination of my employment with BNY Mellon.
For purposes of this Agreement, “BNY Mellon Paid Channel” shall mean any person or entity with whom (a) BNY Mellon has an agreement whereby BNY Mellon is obligated to pay a referral fee or other compensation to such person or entity in connection with any Wealth Management Services provided by Wealth Management or other BNY Mellon entity (in the latter case though only to the extent that the BNY Mellon Entity is providing asset management services to the affiliate through an advi-sor/sub-advisor arrangement or a dual officer arrangement) which is in effect on the date of termination of my employment with BNY Mellon, or (b) received payment of such referral fee or other compensation at any time during the twelve (12) month period immediately preceding the date of termination of my employment with BNY Mellon ... ([5])
5.1 understand that for purposes of this Agreement, “Relevant Wealth Management Services” means Wealth Management Services as provided by BNY Mellon from time to time at any time during the twelve (12) months preceding my termination date
12.1 acknowledge and agree that the covenants set forth herein are reasonable and valid in duration and scope and in all other respects. I represent that my experience and capabilities are such that the enforcement of the provisions of this Agreement will not prevent me from earning my livelihood, and acknowledge that it would cause BNY Mellon serious and irreparable injury and cost if I were to use my ability and knowledge in breach of the obligations contained in this Agreement in competition with BNY Mellon. I also agree that upon BNY Mellon’s request, I will certify that I am in compliance with the Agreement.
13. I represent and warrant that I have read and reviewed this Agreement in its entirety and that I have been given an opportunity to ask BNY Mellon questions about it. I also represent and warrant that I have been given an opportunity to consult with an attorney of my choice prior to executing this Agreement and that I have had a reasonable period of time to consider the Agreement. I fully understand the terms of this Agreement and knowingly and freely agree to abide by them . . .
(Verified Compl. at ex. A.)
Schauer signed the Agreement on March 26, 2008. (Verified Compl. at Ex. A; see also Schauer Decl. at par. 7.)[6] There is some dispute whether he was required to do so as a condition of maintaining his employment at BNY Mellon. (Compare Schauer Decl. at par. 7 with Gonsalves Dep.)[7]
At some point after Mellon Financial merged with Bank of New York, Schauer became “discontented.” (Schauer Decl. at par. 14.) He desired to offer clients investment products through an “open architecture” platform rather the range of proprietary products available through BNY Mellon. (Schauer Decl. at par. 15; cf. Verified Compl. at 2-3, par. 2.) He also wished to provide long-term services to clients, rather than move to the Business Development position BNY Mellon sought. (Schauer Decl. at par. 16.) Schauer alleges that he informed his superiors at BNY Mellon that he *332 was speaking to other financial institutions about possible employment. (Schauer Decl. at par. 14.)
At least as early as June 2009, Schauer began communicating with Deutsche Bank Alex. Brown, a division of Deutsche Bank Securities, Incorporated (“Deutsche Bank”). (BNY Mellon Mem. Supp. at Ex. 4.) By September 2009, there were discussions within Deutsche Bank about hiring Schauer in part “to bring [his] existing relationships over” to Deutsche Bank and also to “leverage his existing book [of over $100 million in assets]” and “skillset” [sic], including his legal experience and education. (BNY Mellon Mem. Supp. at Ex. 4.) Meetings between Schauer and employees and executives of Deutsche Bank followed in October and December 2009. (BNY Mellon Mem. Supp. at Ex. 4.)
At some point during the recruitment process, Schauer gave Deutsche Bank certain documents illustrating his performance at BNY Mellon. (See BNY Mellon Mem. Supp. at Ex. 4; Schauer Apr. 14 Dep.)[8] One pair of documents showed the number of new clients he had brought to BNY Mellon in 2008 and revenue generated from each new client, in addition to his performance that year relative to other BNY Mellon “teams” and “Portfolio Officers.” (See BNY Mellon Mem. Supp. at Ex. 4.)[9] Schauer redacted the clients’ names but not the statistics and rankings of specific BNY Mellon Wealth Management teams and Boston-based employees. (See BNY Mellon Mem. Supp. at Ex. 4; Schauer Apr. 14 Dep.) The third document was a list of his approximately 175 client accounts with corresponding dollar amounts of assets under management, annual fees and fee rates. (See BNY Mellon Mem. Supp. at Ex. 4; Schauer Apr. 14 Dep.) He printed that list, which is hand-dated March 10, 2009, from a password-protected computer program at BNY Mellon and redacted the account numbers. (See BNY Mellon Mem. Supp. at Ex. 4; Schauer Apr. 14 Dep.) Schauer alleges that those three documents showed the approximate revenue he had generated for BNY Mellon and that he gave the documents to Deutsche Bank “solely to indicate” his success. (Schauer Suppl. Decl. at par. 7; see Schauer Apr. 14 Dep.)[10]
On Tuesday, March 23, 2010, Schauer informed BNY Mellon that he was leaving to work at Deutsche Bank. (Verified Compl. at 4, par. 9; Schauer Suppl. Decl. at par. 19.) In an attempt to retain him, BNY Mellon made a competitive counteroffer, which Schauer rejected, resigning on March 25. (Verified Compl. at 4, pars. 10-11; Schauer Suppl. Decl. at par. 19.)[11]
During those few days, Schauer had conversations with six clients in which he notified them that he was leaving BNY Mellon to join Deutsche Bank. (Schauer Suppl. Decl. at pars. 16 & 19.)[12] Schauer alleges that there were “a handful” of clients, including those contacted that week, with whom he was “extremely close" and that he “simply told them the truth about [his] employment status.” (Schauer Suppl. Decl. at par. 19.) He states that “at no point did [he] solicit such clients to move their accounts, nor was that ever discussed.” (Schauer Suppl. Decl. at par. 19.) It also appears that at least a few other clients from BNY Mellon were aware that week that Schauer was joining Deutsche Bank. (See BNY Mellon Mem. Supp. at Ex. 5; Schauer Apr. 14 Dep.)[13] Schauer alleges, however, that he did not solicit any of those clients, but rather responded to their inquiries. (Schauer Suppl. Decl. at par. 15.)[14]
Schauer began working at Deutsche Bank on Friday, March 26. (Verified Compl. at 4, par. 15.) During that day, he sent an announcement of his new position to “approximately 50" clients. (Schauer Decl. at par. 17; see also Verified Compl. at 4, par. 15; Graham Aff. at par. 6.) The Deutsche Bank-captioned announcement stated: ”We are pleased to announce that Coiy B. Schauer has joined Deutsche Bank Alex. Brown as a Vice President in our Boston Office." (Verified Compl. at Ex. C.; see Schauer Decl. at par. 17.) The announcement listed general contact information for the Boston office and direct contact information for Schauer. (Verified Compl. at Ex. C; see Schauer Decl. at par. 17.) Schauer sent the announcements by either regular mail, overnight delivery or e-mail. (See Schauer Decl. at par. 17; see also Verified Compl. at 4, par. 16, & 5, par. 19; Graham Aff. at par. 6; Gonsalves Aff. at par. 6.)[15]
Schauer had given Deutsche Bank a list of contacts for the announcements by March 25. (See BNY Mellon Mem. Supp. at Ex. 4.; Schauer Apr. 14 Dep.) He had typed up the list on his home computer at some point using client contact information contained in his personal Blackberry (see Schauer Apr. 14 Dep.; Schauer Decl. at pars. 17 & 20) to which he had transferred all his client contact information from his BNY Mellon-leased Blackberry about a month before resigning (Schauer Apr. 14 Dep.).[16] Schauer alleges that he knew those clients “intimately,” including their home addresses, and thus that he could have “easily recreate [d] such list” from memory and publicly available sources. (Schauer Decl. at par. 20.)[17] Schauer states that he took no BNY Mellon documents or information with him when he resigned (see Schauer Decl. at pars. 17 & 20) and that he left behind all his BNY Mellon files “entirely intact.” (Schauer Decl. at par. 23.)
Also on March 26, BNY Mellon Wealth Management employees (Sales Officer Brenda Travaglini, Senior Director Jeremy Gonsalves and Regional President Vicary Graham) began calling Schauer’s clients to reassign them to new portfolio managers and assure them that BNY Mellon would continue to provide them with the same level of wealth management services as they had received with Schauer. (Verified Compl. at 4, par. 13; see Graham Aff. at par. 3; Gonsalves Aff. at par. 3; Travaglini Aff. at par. 3.) Of the approximately *333 90 clients called, a “majority” reported having been contacted by Schauer or Deutsche Bank and knew that he was leaving BNY Mellon for Deutsche Bank. (Verified Compl. at 5, par. 14; Graham Aff. at par. 4; Gonsalves Aff. at par. 4; Travaglini Aff. at par. 4.)[18] “Many” of those contacted apparently received e-mail notification. (Verified Compl. at 5, par. 14.)
The Verified Complaint alleges that one “particular high-net-worth client,” with a $30 million account at BNY Mellon, told Travaglini on March 29 that he had decided to transfer his account to Deutsche Bank. (Verified Compl. at 5, pars. 17-18; see Graham Aff. at par. 7; Gonsalves Aff. at par. 7; Travaglini Aff. at par. 5.) However, in an affidavit, Steven Cohen identifies himself as that client and states that “any insinuation” that he told Travaglini that Schauer had solicited him to move his accounts is “completely inaccurate." (Steven Cohen Aff. at pars. 6 & 8.) According to the affidavit, Cohen does business with Schauer because Cohen likes and trusts him and “would follow him to any firm that employed him.” (Steven Cohen Aff. at par. 4.)
About two weeks later, during a meeting with a Wealth Management Senior Portfolio Manager, a client of Schauer’s at BNY Mellon reportedly said that he had been contacted and solicited by Schauer to transfer his assets to Deutsche Bank. (Newman Aff. at par. 4.) Allegedly, Schauer had told the client that his assets would be better served by Deutsche Bank’s open architecture platform and that moving his money to that company would be easy. (Newman Aff. at par. 5.) Schauer alleges, however, that he “merely responded” on March 29 to the client’s e-mail from the prior day and “at no time” solicited him to move his accounts to Deutsche Bank. (Schauer Suppl. Decl. at par 24.)[19]
Since starting at Deutsche Bank, Schauer has had numerous telephone and e-mail communications with clients to whom he provided investment services at BNY Mellon (see BNY Mellon Mem. Supp. at Ex. 5), and at least twice has had meetings with BNY Mellon clients also attended by his partner at Deutsche Bank (see Schauer Apr. 14 Dep). BNY Mellon asserts that at least nine of Schauer’s clients have already signed, or are in the process of signing, paperwork to transfer their accounts to Deutsche Bank. (See BNY Mellon’s Mem. Supp. Mot. for Prelim. Inj. at 6.)[20] Those clients include Steven and Jane Cohen, Doris Jones, Max Cohen, Frank and Sylvia Laverde, Matthew Rich, Sebastien Tran, George Konefal and Rosa Crenza, Randall and Maiy Roy and Herbert Leventhal. (See BNY Mellon’s Mem. Supp. Mot. for Prelim. Inj. at 6.)
Significantly, several of Schauer’s clients from BNY Mellon, including some who apparently have transferred accounts to Deutsche Bank or who are considering doing so, have submitted affidavits attesting to the fact that they were not solicited by Schauer to move their accounts. (See Steven Cohen Aff. at par. 8; Jones Aff. at par. 4; Konefal Aff. at par. 4; Sheckman Aff. at par. 4; Zavez Aff. at par. 4.)
DISCUSSION
Whether to grant a preliminary injunction involves application of the balancing test set forth in Packaging Indus. Group, Inc. v. Cheney, 380 Mass. at 616-17. See, e.g., Carroll v. Marzilli, 75 Mass.App.Ct. 550, 552 (2009). “(T]he judge initially evaluates in combination the moving parly’s claim of injury and chance of success on the merits.” Packaging Indus. Group, Inc. v. Cheney, 380 Mass. at 617. “If the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party” (footnote omitted). Id., at 617. In balancing those considerations, “(w]hat matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits.” Id. “Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue.” Id.
“(T]he significant remedy of a preliminary injunction should not be granted unless the plaintiff!) ha[s] made a clear showing of entitlement thereto.” Student No. 9 v. Board of Educ., 440 Mass. 752, 762 (2004), citing Landry v. Attorney Gen., 429 Mass. 336, 343 (1999). Whether to grant a preliminary injunction is a matter of discretion for the judge, see, e.g., GTE Prods. Corp. v. Stewart, 414 Mass. 721, 722 (1993), as is the scope of any equitable relief ordered, see, e.g., Borne v. Haverhill Golf & Country Club, Inc., 58 Mass.App.Ct. 306, 323-24 (2003), citing Commonwealth v. Adams, 416 Mass. 558, 566 (1993); Cahaly v. Benistar Prop. Exch. Trust Co., 68 Mass.App.Ct. 668, 679 (2007). In its exercise of discretion, the Court is mindful that “the purpose of a preliminary injunction is ‘only to preserve the status quo while the case is under consideration.’ ” Petricca Const. Co. v. Commonwealth, 37 Mass.App.Ct. 392, 399 (1994), quoting Jet-Line Servs., Inc. v. Selectmen of Stoughton, 25 Mass.App.Ct. 645, 649-50 (1988).
As a threshold challenge, Schauer argues that the Agreement is void for lack of adequate consideration. As with any contract, the Agreement must be supported by good and sufficient consideration to be valid and binding. Cf., e.g., Economy Grocery Stores Corp. v. McMenamy, 290 Mass. 549, 552 (1935). But, as BNY Mellon correctly argues, the record shows that Schauer received such consideration. The Agreement expressly indicates that Schauer was awarded 661 shares of restricted stock in exchange for agreeing to be bound by the terms of the Agreement. The plain language is clear and unambiguous that the stock was awarded in consideration for Schauer’s executing the Agreement and that, by so signing, Schauer was acknowledging the adequacy, sufficiency and receipt of that consideration. The Agreement admits of no am- *334 biguify that would permit the Court to consider the extrinsic evidence offered by Schauer that the stock was instead intended as part of his 2007 compensation. See, e.g, General Convention of New Jerusalem in the United States of America, Inc. v. Mackenzie, 449 Mass. 832, 835-36 (2007); Eastern Holding Corp. v. Congress Fin. Corp., 74 Mass.App.Ct. 737, 741-42 & n.5 (2009). The Agreement is not void for want of consideration.
Notwithstanding the validity of the Agreement as a whole, the parties disagree whether the restrictive covenants at issue are enforceable and whether Schauer has breached those contract provisions. Under settled law, such covenants will be enforced if (i) necessary to protect an employer’s legitimate business interests (ii) reasonably limited in time and space, in light of the facts of the case, and (iii) consonant with the public interest. See Whitinsville Plaza v. Kotseas, 378 Mass. 85, 102-03 (1979), and cases cited; New England Canteen Serv., Inc. v. Ashley, 372 Mass. 671, 674 (1977), citing cases. There is no real dispute that each covenant at issue here on its face serves to protect legitimate business interests, see, e.g., Marine Contrs. Co. v. Hurley, 365 Mass. 280, 287 (1974) (protectable interests include trade secrets, confidential data and goodwill) or that the confidentiality and nonsolicitation provisions are generally enforceable. Schauer instead focuses his challenge on the enforcement of paragraph 3(a) (iii) of the Agreement, which restricts him for 12 months from providing financial services to clients whom he had at BNY Mellon.[21]
As to that challenge, the Court sees a likelihood that BNY Mellon will succeed at trial in establishing that that provision is enforceable, but agrees with Schauer that 12 months is unreasonable on this record. As an initial matter, the provision is plainly written, and the Court declines to permit Schauer, an experienced attorney, to escape its restrictions by arguing after the fact that it was unreasonable.[22] Indeed, by signing the Agreement, Schauer expressly acknowledged and agreed, under paragraph 12, “that the covenants set forth [in the Agreement] [were] reasonable and valid in duration and scope and in all other respects.”
Nevertheless, the Court is mindful of the interests of Schauer’s clients in retaining his services, or at least having the option to do so. It would seem inequitable to grant relief to BNY Mellon that in some way penalizes the financial or other interests of those clients. As the Court recognized in crafting its Temporary Restraining Order, there is no public interest value in interfering with the decisions of clients who have already manifested their intention to seek Schauer’s services at Deutsche Bank. In addition, there is unfairness in enforcing a covenant that effectively appropriates client goodwill that rightly belongs to Schauer. See, e.g., Sentry Ins. v. Firnstein, 14 Mass.App.Ct. 706, 708 (1982), citing 6A Corbin, Contracts §139IB (1982 Sup.) (“The objective of a reasonable noncompetition clause is to protect the employer’s good will, not to appropriate the good will of the employee").[23] In sum, while it is fair to enforce against Schauer the provisions of the Agreement generally, it is inequitable to enforce those provisions where doing so harms the interests of third parties or exceeds the reasonable objective of the Agreement.
In the similar circumstances involved in American Express Fin. Advisors, Inc. v. Walker, Suffolk Super.Ct. Civ. No. 1998-01673, 1998 WL 754620, at *8 (Oct. 28, 1998) (Gants, J.) [9 Mass. L. Rptr. 242], a four-month restriction was found to balance the interests of the parties. As explained in that decision, that period of time gives the financial institution a fair opportunity to establish a rapport with the financial manager’s former clients but does not significantly impede those clients over the long term from moving their accounts if they were really attracted to the manager rather than the institution.
The remainder of the parties’ dispute on the merits of BNY Mellon’s case concerns the likelihood of success in establishing that Schauer breached the Agreement. Specifically, the parties focus on the question whether Schauer has violated the Agreement’s confidentiality and nonsolicitation provisions.
As to the former, BNY Mellon argues that Schauer provided financial documents and a customer list to Deutsch Bank that fall within the rubric of Confidential Information as defined in paragraphs 2 (a)-(b) of the Agreement. Given the broad, but not unreasonable, reach of that provision, there seems a likelihood of success in proving that claim. The three documents given to Deutsche Bank during the recruiting period revealed financial statistics and rankings of BNY Mellon employees that could implicate subsection (iii) (“information relating to other officers and employees of BNY Mellon”) or (iv) (“financial results and information about the business condition of BNY Mellon”).[24] Also, the client list for the announcements could be considered “customer and potential customer prospecting lists and contact persons at such customers and customer prospects” or otherwise come within the catchall information needed to solicit customers or employees “considered by BNY Mellon to be confidential.” While the publicly-available contact information for clients with whom Schauer was “intimately familiar” would seem to escape classification as confidential information, those clients were not the only ones on the list given to Deutsche Bank.
With respect to solicitation, the facts presents a much closer call. The record reveals that Schauer sent out announcements to clients notifying them of his move to Deutsche Bank using contact information gained, at least in part, from and during his employment at BNY Mellon. He also directly informed certain clients of his impending move. Absent from the record, however, is competent evidence establishing overt solicitation. Nonsolicitation does not mean no contact. *335 Although Schauer’s targeted communications may be fairly seen as more than the mere courtesies he alleges, there is insufficient evidence of something more than a reasonable inference of client persuasion. In brief, the record does not adequately establish at this stage Schauer’s violation of the nonsolicitation covenant.[25]
Finally, as to the question of harm, “(i]n the context of a preliminaiy injunction the only rights which may be irreparably lost are those not capable of vindication by a final judgment, rendered either at law or in equity.” Packaging Indus. Group, Inc. v. Cheney, 380 Mass. at 617 n.11. Were it merely a matter of money, as Schauer argues, the Court would agree that such damages are generally not considered irreparable, see, e.g., Fisher v. Board of Selectmen of Nantucket, 453 F.Sup. 881 (D.Mass. 1978), especially for a financial institution such as BNY Mellon, see Tri-Nel Mgmt., Inc. v. Board of Health of Barnstable, 433 Mass. 217, 227-28 (2001), quoting Hull Mun. Lighting Plant v. Massachusetts Mun. Wholesale Elec. Co., 399 Mass. 640, 643 (1987) (“Economic harm alone, however, will not suffice as irreparable harm unless ‘the loss threatens the very existence of the movant’s business’ ”). But Schauer rightly concedes that “damage to client relationships and customer goodwill has been held to be ‘irreparable harm’ under Massachusetts law,” Bear, Stearns & Co., Inc. v. Sharon, 550 F.Sup.2d 174, 178 (D.Mass. 2008), citing All Stainless, Inc. v. Colby, 364 Mass. 773 (1974), and BNY Mellon argues with some force that it risks unquantifiable harm in the form of lost client trust and confidence. See, e.g., North Am. Expositions Co. Ltd. Partnership v. Corcoran, 452 Mass. 852, 869-70 (2009), citing cases (good will includes company’s positive reputation in eyes of its customers or potential customers and is generated by repeat business with existing customers or by referrals to potential customers). More is at stake than just difficulty determining the amount of damages, as Schauer contends. There is a quality to the harm faced by BNY Mellon not adequately compensable by money damages.
Having determined that the failure to issue some form of injunction would subject BNY Mellon to a substantial risk of irreparable harm, the Court turns to weighing that risk against the risk of irreparable harm to Schauer by granting an injunction. Packaging Indus. Group, Inc. v. Cheney, 380 Mass. at 617. While the Courtis of course mindful of Schauer’s argument that an injunction could harm his professional standing and his ability to earn a living, the Court cannot disregard the fact that, in exchange for stock with significant value, Schauer entered into a contract in which he expressly represented the opposite of what he now argues. In that sense, the Court credits BNY Mellon’s point that the harms Schauer alleges are of his own making. In any event, he is not prevented from working at Deutsche Bank or competing generally with BNY Mellon.
Putting all the pieces together, the Court shall grant BNY Mellon’s request for an injunction enforcing for 12 months the restrictive covenants contained in paragraph 3(a) of the Nonsolicitation and Confidentiality Agreement executed by Schauer on March 28, 2008, but denying the request with respect to restricting Schauer from providing the wealth management services described in subsection 3 (a) (iii). The order enforcing that restriction shall extend for four months but shall not apply to any customer or client who has already transferred, or begun to transfer, his or her accounts to Deutsche Bank. The order shall apply equally to “Customers,” as defined in the Agreement, and customers of a BNY Mellon Paid Channel. Time periods shall extend from the day of Schauer’s separation from employment with BNY Mellon. The order shall also continue the obligations upon Schauer set forth in Section 3 of the Court’s April 14 Order.
ORDER
For the foregoing reasons, the motion for a preliminary injunction filed by BNY Mellon, N.A., is ALLOWED in part and DENIED in part. The parties are to provide the Court with a form of final order within seven days.

 Vicary N. Graham, Regional President of BNY Mellon Wealth Management, signed the Verification.

 Mellon Financial Corporation merged with Bank of New York in 2007 to become The Bank of New York Mellon Corporation, of which BNY Mellon is a wholly owed subsidiary. (Verified Comp, at 2, par. 2 n.1.)

 Schauer had been an attorney in private practice for over 10 years. (See Schauer Decl. at par. 4.) In addition to a law degree, he had a Masters of Law in taxation. (See Schauer Decl. at par. 4.) Schauer alleges that he learned “largely on [his] own” about securities and financial markets and was not provided “formal training in that regard” by Mellon Financial. (Schauer Decl. at par. 5.) Schauer testified at his deposition that he did, however, receive “training to inform individuals about the resources of BNY Mellon.” (Schauer Apr. 14 Dep.)

 Schauer alleges that he was assigned “only a handful" of pre-existing clients, although Mellon Financial (and later BNY Mellon) was structured so that “typically” portfolio managers provided services to clients acquired by Business Development employees. (See Schauer Decl. at par. 10.) Of the “approximately 81" clients discussed at his deposition, Schauer testified that seven were his "law clients" whom he brought to Mellon Financial: 38 were “new clients” who were referred to him either by existing clients or “third-party sources of referral not affiliated with BNY Mellon (i.e. not ‘BNY Mellon Paid Channel’)”: one was a “new client” Schauer personally knew; one was a “new client” Schauer met through a mutual friend, and one was his father-in-law. (Schauer Suppl. Decl. at par. 3.) Schauer also testified that, of the “approximately 33" other clients: nine were ’’new clients" referred to him through BNY Mellon’s Paid Channel “but who had no preexisting relationship with BNY Mellon and whom [he] brought in largely through his own efforts"; 11 were “new clients” referred to him through “other BNY Mellon sources, but who had no preexisting relationship with BNY Mellon and whom [he] substantially assisted in bringing to BNY Mellon”; 11 were BNY Mellon clients reassigned to him; one was a BNY Mellon employee, and one was the relative of a BNY Mellon employee. (Schauer Suppl. Decl. at par. 4.)

 The BNY Mellon Paid Channels with which Schauer “dealt” included Mass. Mutual, Metlife, and smaller companies and professional individuals, such as CPAs. (Schauer Suppl. Decl. at par. 25.) Schauer states both that these Paid *336 Channels did not have “an exclusive relationship" with BNY Mellon and that he “was not the exclusive BNY Mellon employee to deal with them.” (Schauer Suppl. Decl. at pars. 26-7.)

 Schauer alleges that he received the 661 shares of restricted stock referenced in the Agreement as part of his 2007 compensation (Schauer Suppl. Decl. at pars. 5-6), but the Managing Director of BNY Mellon’s Wealth Management Group in Boston “unequivocally state[s]” in his affidavit that Schauer received the stock in exchange for signing the Agreement (Dicker Aff. at par. 4).

 Schauer states in his declaration that he was informed that he would remain employed with BNY Mellon only if he signed the Agreement. (Schauer Decl. at par. 7.) However, Wealth Management Senior Director Jeremy Gonsalves testified at his deposition that BNY Mellon only requires portfolio managers to sign nonsolicitation and confidentiality agreements upon initial hire, and otherwise permits them to remain employed in those positions without such agreements in force. (Gonsalves Dep.)

 Schauer testified at his deposition that it was “[pjerhaps” in the fall of 2009. (Schauer Apr. 14 Dep.)

 One document appears to show that Schauer brought in 22 new clients in 2008, generating $903,348 in gross revenue and $775,503 in net revenue. (See BNY Mellon Mem. Supp. at Ex. 4; see also Schauer Apr. 14. Dep.) That document indicates that Schauer “had more new business that 88 BNY Mellon WM teams” and that he would be ranked 13th if he were a “team.” (See BNY Mellon Mem. Supp. at Ex. 4; see also Schauer Apr. 14. Dep.) Schauer created that document in preparation for discussing his bonus at BNY Mellon in 2009. (Schauer Apr. 14. Dep.) The other document, which compares Schauer to Boston-based portfolio officers, was a chart left on his desk at BNY Mellon with the note: “You blew all away!” (BNY Mellon Mem. Supp. at Ex. 4; see Schauer Apr. 14. Dep.)

 Schauer states that he did not retain copies of the documents provided to Deutsche Bank and alleges that Deutsche Bank used those documents only for purposes of determining whether to hire him. (Schauer Suppl. Decl. at par. 8.) It is his “understanding that such documents [were] returned by Deutsche Bank to BNY Mellon immediately after the Court issued the [Temporary Restraining Order on April 14, 2010].” (Schauer Suppl. Decl. at par. 8.)

 As part of the exit process, BNYMellon’s general counsel wrote Schauer a letter on March 25 reminding him of his obligations under the Agreement. (Verified Compl. at 4, par. 12; see Verified Compl. at Ex. B.) On March 30, BNYMellon’s general counsel wrote to Deutsche Bank’s general counsel regarding Schauer’s obligations under the Agreement. (Verified Compl. at Ex. B.)

 Those six clients were Steven Cohen, with whom Schauer spoke “almost daily”; Herbert Leventhal, Schauer’s father-in-law; Matthew Roth and Sebastian Tran, “law client[s]” with whom Schauer has “a very close relationship”; and two clients referred to Schauer by “third-party CPAs who were not part of BNY Mellon’s Paid Channel.” (Schauer Suppl. Decl. at pars. 17-18.) Schauer also had a conversation with Cohen’s trusts and estates attorney on March 23 in which he told her he was “probably going to make a change.’’(Schauer Apr. 14 Dep.)

 On his first day at Deutsche Bank, but before Schauer sent out announcements of his move to that firm, Schauer received telephone calls from clients he had at BNY Mellon. (See BNY Mellon Mem. Supp. at Ex. 5; Schauer Apr. 14 Dep.)

 According to Schauer, two clients were informed of his move to Deutsche Bank by his friend, whom Schauer in turn had told earlier that week; another was a “former law client” Schauer had brought to BNY Mellon and with whom Schauer had directly spoken about moving. (See BNY Mellon Mem. Supp. at Ex. 5; Schauer Apr. 14 Dep.)

 The Verified Complaint alleges ”[u]pon information and belief’ that, on Saturday, March 27, “many” of Schauer’s clients and paid channel advisors received an overnight packet containing information about Schauer’s recent hiring. (Verified Compl. at 4, par. 16; see also Graham Aff. at par. 6; Gonsalves Aff. at par. 6.) Schauer disputes that he sent a “packet” and states that the matter contained only his announcement card. (See Schauer Decl. at par. 18.)

 Schauer testified at his deposition that, when he purchased a new Blackberry in late February 2010, a Verizon Wireless employee “backed up” the contact list from his BNY Mellon-leased Blackberry to the new device. (Schauer Apr. 14 Dep.) It is unclear from the record the number of additional contacts Schauer entered into the new device after that point: he testified that he “constantly update[d his] Blackberry ...” (Schauer Apr. 14 Dep.)

 Schauer had been to “most” of those clients’ homes. (Schauer Decl. at par. 20.)

 Schauer disputes that he had 90 clients and instead ”believe[s] that the total number of [his] clients [was] closer to approximately 60 . . .” (Schauer Decl. at par. 20.) “[M]any of [his] clients were families.” (Schauer Decl. at par. 20.)

 On March 28, the client, Armand Pescione, e-mailed Schauer at his Deutsche Bank address: “Hi[.] Best of luck[.] [H]ow do I proceed in transferring [sic] my holdings!.] BNY has contacted me on your move! I am just back from Los Carbos. I have some questions before I move my money[.] Arlene is interested in speaking with you!” (Schauer Suppl. Decl. at par. 22 & Ex. 2.) The next day, Schauer responded by e-mail: “Hello Armand: Thank you for your email. Welcome home. Per your request I will call you later today. Cory.” (Schauer Suppl. Decl. at par. 23 & Ex. 3.)

 The discovery materials cited to support this assertion were not included with those provided to the Court.

 Schauer implicitly acknowledges that he has breached this provision. (See Def.’s Mem. in Opp. to Plf.’s Mot. for T.R.O. at 15.)

 While there may be some question whether Schauer could have refused to sign the Agreement and still maintain his position at BNY Mellon, he does not press an argument in his motion papers that the Agreement was a contract of adhesion. The unequal bargaining power often at issue in the employer-employee context, cf., e.g., Boulanger v. Dunkin' Donuts, Inc., 442 Mass. 635, 639-40 (2004), citing Wells v. Wells, 9 Mass.App.Ct. 321, 323-25 (1980), seems belied on the facts of this case by the affirmative representations in paragraph 13 of the Agreement.

 The record does show that much of the good will belongs to Schauer. Granted, BNY Mellon provided him the platform with which to work, but this was not a case where the employee owed his abilities to the training and experience provided by the employer. Schauer’s significant outperformance of others at the firm speaks to his skill, not BNYMellon’s financial products. Notably, BNY Mellon has not disputed Schauer’s allegations that he brought clients from his law practice or, apparently unlike other BNY Mellon portfolio managers, that he developed the majority of his clientele.

 Because the names and account numbers were redacted, it is more difficult to conclude those documents also included “material information concerning customers of BNY Mellon or their operations, condition (financial and otherwise) or plans.”

 The Court agrees with the observations about subtle and implicit solicitation expressed by Judge Gants in American Express Fin. Advisors, Inc. v. Walker, Suffolk Super.Ct.Civ. No. 1998-01673, 1998 WL754620, at *8 & n.9 (Oct. 28, 1998) [9 Mass. L. Rptr. 242], but finds the facts in the record of this case distinguishable.